140 N.J. Super. 164 (1976)
355 A.2d 695
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROBERT SIMS, ROBERT JAMES BROWN AND MICHAEL HIGHTOWER, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 13, 1976.
Decided March 8, 1976.
*166 Before Judges LYNCH, LARNER and HORN.
*167 Mr. James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant Sims (Mr. Stanley C. Van Ness, Public Defender, attorney).
Ms. Marianne Nelson, designated counsel, submitted a brief on behalf of appellant Brown (Mr. Stanley C. Van Ness, Public Defender, attorney; Mr. Edward Carl Broege, designated counsel, of counsel and on the brief).
Mr. Stephen Apollo, designated counsel, argued the cause for appellant Hightower (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Marc J. Friedman, Special Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney General, attorney).
The opinion of the court was delivered by LYNCH, P.J.A.D.
Defendants appeal from their convictions, following a consolidated trial, for several crimes which arose out of an incident wherein Police Officers Donald Alexander and John Walsh of the Trenton Police Department were shot but, fortunately, did not die.
Defendants Sims and Hightower were found guilty of attempted murder and atrocious assault and battery on Officer Walsh, of aiding and abetting the attempted murder and atrocious assault and battery on Officer Alexander, of being armed while committing the assaults and of carrying a weapon without a permit. Defendant Brown was convicted of attempted murder and atrocious assault and battery on Officer Alexander, of aiding and abetting the attempted murder and atrocious assault and battery on Officer Walsh, of being armed during the assaults and of carrying a weapon without a permit.
In overlong briefs (totaling more than 300 pages) defendants raise some 30 points, with subdivisions in several. *168 To recite all the contentions would serve only to inundate the central issues which are worthy of note. In the interest of concentrating on the latter, we have concluded that discussion of the following issues suffices for effective consideration of the appeals:
I. Should the convictions of defendants Sims and Hightower be reversed because of the prejudicial effect of the admission into evidence of a redacted confession by defendant Brown which assertedly implicated Sims and Hightower in the commission of the crimes?
II. Did the trial judge commit reversible error when it refused to interrogate prospective jurors about possible racial prejudice in a context of charges that defendants, all of whom are black, shot two white policemen?
III. Was the charge as to the crime of aiding and abetting erroneous?
IV. Was the prosecutor's summation prejudicially improper and beyond the limts of fair comment?
Defendants also contend that their convictions for atrocious assault and battery merge with their convictions for attempted murder. The State concedes such merger is appropriate and we agree. Therefore no further comment will be made on that issue.

I

The prejudicial effect (as against defendants Sims and Hightower) of the admission of the redacted confession of defendant Brown
The indictments of all three defendants were consolidated for trial over the objections of defendants.
Defendant Brown had given the police the statement referred to above in which he had named defendants Sims and Hightower as participants in the crime. Under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), an extra-judicial confession of a defendant which implicates a codefendant is inadmissible in a consolidated *169 trial. In an attempt to avoid that problem here the trial judge edited Brown's statement by striking from it the names of Sims and Hightower and, in each instance where those names appeared, substituting the word "blank." As so edited and permitted in evidence, Brown's confession read in relevant part:
Well, me, blank and blank, were coming through the alley that runs from Spring Street to Passaic Street, and we walked down Passaic Street towards Camden Street and we saw this man walking towards us and blank said to blank and me, "What are you going to do?" and at this time a patrol car pulled up and asked for identification. And blank went to the driver's side of the patrol car and he pretended to pull his wallet from his back pocket when the officer seen the gun in blank's belt then the officer on the passenger side of the car pulled his gun and they started shooting. Then blank pulled his gun and he started shooting at the police and I got scared and start running up the alley alongside the canal. I had a .22 caliber automatic but I didn't pull it, and it only had four bullets in it. I was running up Hanover Street towards town when blank, who was behind me, hollered to me, and when I looked I saw blank running behind blank. We all ran to the parking lot behind Wilkenson Place and I saw Junie Wilkins sitting in the car. I think it was a brown Duster. He was with three other fellows in the car and they were parked on Wilkenson Place near Willow Street. I went up to Wilkins who was sitting on the passenger side of the car. I know Wilkins for a long time. Then blank and blank handed me their guns and I passed all the guns to Wilkins and he said, "What's this for?" and I told him to take them. He said okay and they drove away. We then split up and I went to Soul Birds on Hanover Street.

* * *
Question: Mr. Brown, can you describe the clothing worn by Blank and Blank on the night of the above offense?
Answer: Yes, Blank had a brown corduroy coat and dark brown pants and he also had on a big soft cap; it was a dark one.
The New Jersey rule regarding the use of confessions of codefendants was set down in State v. Young, 46 N.J. 152 (1965). That case involved a confession by a codefendant (Williams) which implicated defendant Young by name. The Supreme Court reversed Young's conviction. The court noted that Williams' extra-judicial confession was inadmissible against Young because to admit it would violate *170 Young's right to be confronted with the witnesses against him. The court held that merely instructing the jury that Williams' confession was inadmissible against Young was insufficient to overcome the potential prejudice of the situation. Thus, the court ordered that a confession of one defendant implicating his codefendants could be used at trial only where there could be an effective deletion of all references to the codefendants without prejudice to the confessing defendant. The court further stated that "[b]y effective deletion we mean the elimination of not only direct and indirect identification of codefendants but of any statements that could be damaging to the codefendants once their identity is otherwise established." 46 N.J. at 159.
In order to weigh the prejudicial effect of admitting the confession here it is necessary to examine the circumstances surrounding its introduction. First of all, defendant Brown, whose statement is under consideration, was on trial with two other men  defendants Sims and Hightower. This in itself could easily have led the jury to conclude that "blank" and "blank" named in this statement were in fact Sims and Hightower. Moreover, in light of other evidence which had been adduced, the admission of Brown's confession even more powerfully incriminated Sims and Hightower. Prior testimony had indicated that all three defendants were walking down the street together when Officers Alexander and Walsh approached in their patrol car. Thus, when Brown's statement mentioned that he was walking with "blank" and "blank" when they were stopped by a patrol car, the jury had no choice but to conclude that Brown was referring to Sims and Hightower. Therefore, when the confession next said that "blank" started shooting at the police, the jury could not fail to understand that this referred to one of Brown's codefendants. When the confession further mentioned that the other "blank" also started shooting at the police, by process of elimination this had to mean the second codefendant. Thus, Brown's statement unequivocally pointed the finger of guilt directly at Hightower and Sims despite *171 the deletion of their names. As if all this were not enough, the trial judge also refused to delete from the statement Brown's description of what one of his companions was wearing. This description coincided with that given by Alexander and Walsh of one of the assailants. Since Alexander and Walsh had identified Hightower and Sims as among their assailants, this again drove home to the jury the point that this "blank" was either Hightower or Sims. See United States v. Bozza, 365 F.2d 206, 214-218 (2 Cir.1966), which explicitly rejected the procedure adopted by the trial judge in this case.
The State contends that any error that resulted from admitting Brown's statement was harmless error. We disagree. Before a federal constitutional error can be held harmless, the court must be able to declare that it was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Macon, 57 N.J. 325, 340-341 (1971). The statement at issue here was so powerfully incriminating that it undoubtedly had a substantial potential for affecting the jury's verdict as to Hightower and Sims.
An examination of Brown's statement shows that it incriminated Brown only insofar as it placed him at the scene of the crime. The statement's main thrust, when taken in the context of the evidence adduced at trial, was to implicate Hightower and Sims. As such it should not have been admitted. We hold that its admission constituted error warranting reversal of the convictions of defendants Hightower and Sims.
The trial judge's decision to edit Brown's statement in the manner described was pursuant to a letter opinion before trial. Motion for leave to appeal from that decision was filed. The Appellate Division denied the motion. Leave to appeal was then sought in the Supreme Court. Again the motion was denied. However by way of supplement to its order the court suggested the "possibility" of employing the procedure used in United States v. Rickey, 457 F.2d 1027 *172 (3 Cir.), cert. den. 409 U.S. 863, 93 S.Ct. 153, 34 L.Ed. 2d 110 (1972). Under that procedure the police officer to whom Brown confessed would be permitted to testify as to Brown's admissions of his own conduct. The court was careful not to approve the Rickey procedure but merely suggested it for consideration by the trial judge. The trial judge refused to adopt that suggestion. With the same reservations, we suggest that on remand the court is to consider the possibility of adopting the Rickey procedure or granting a severance.

II

The refusal of the trial court to interrogate prospective jurors about possible racial prejudice
Counsel for defendant Brown requested the trial judge to ask the veniremen the following questions:
Do you subscribe to the principle that everyone, regardless of race, color, creed or position in society, is entitled to a fair trial according to our law?
Has anyone prejudice, bias, or sympathy, based solely on a person's background or personal appearance?
Counsel for defendant Sims requested this question:
Would the mere fact that the alleged victims in this case are white and the defendants black in any way affect your ability to sit on this case?
The trial judge refused to ask such questions.
The United States Supreme Court has twice addressed itself to the issue of a defendant's right to question jurors about racial prejudice. In Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931), the court decided that as to federal jurisdictions the "essential demands of fairness" required that a question relative to racial prejudice be put to the jurors in the trial of a black defendant for the murder of a white policeman. 283 U.S. at *173 309-311, 51 S.Ct. 470. Forty years later, in Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), the court held in a case arising out of a state court that "essential fairness required by the Due Process Clause of the Fourteenth Amendment" mandated that defendant Ham be permitted to have the jurors in his case interrogated on the issue of racial bias. 409 U.S. at 526-527, 93 S.Ct. at 850. Ham, a young black man well known for his work in civil rights organizations such as the Southern Christian Leadership Conference, had been tried for possession of marijuana. His basic defense at the trial was that law enforcement officers were out to get him because of his civil rights activities and had framed him on the drug charge.
This court recently held that the issue of whether questions relating to racial prejudice must be asked is a matter committed to the trial court's discretion unless, as in Ham, supra, racial overtones or prejudices are present in the case. State v. Long, 137 N.J. Super. 124 (App. Div. 1975). In Long we also observed that where a defendant requests a voir dire inquiry as to potential racial prejudice it is the better practice for the court to accede to the request and pose simple, direct questions addressed to the specific element of prejudice alleged. In this case where three black men are charged with the attempted murder of two white police officers we conclude that such questions are appropriate. On the retrial the judge is to accede to defendants' request that such questions be asked.

III

The charge as to aiding and abetting
It is clear in New Jersey that a defendant can be held as an aider or abettor only if he had the same criminal intent that must be possessed by the principal wrongdoer. State v. Sullivan, 43 N.J. 209, 236-237 (1964). Our Supreme Court has stated that "the jury should be plainly told that one cannot be held as an aider or abettor unless it *174 is found that he shared the same intent required to be proved against the actual perpetrator." State v. Madden, 61 N.J. 377, 396-397 (1972). This standard recognizes that an individual can act concurrently with another and yet not share his purpose.
In the instant case the judge's charge on aiding and abetting read as follows:
Now, as to aiding and abetting, those words mean that the defendants were acting in consort, that is aiding and abetting each other in the commission of the crime charged. A section of our statutes provide: "Any person who aids, abets, counsels, commands, induces or procures another to commit a crime is punishable as a principal."
This provision means that not only is the person who actually commits the Criminal act responsible for it, but those who are aiding and abetting are also responsible.
The word "aid" as contained in the statute means to assist, support and supplement the efforts of another. And, the word, "abet" means to encourage, counsel, incite or instigate the commission of a crime. If you find that any of the defendants wilfully and knowingly aided and abetted the other or others in the commission of the offense, you must consider him as a principal.
Concerted action does not have to be proved by direct evidence of a formal plan to commit a crime, verbally concurred in by all that are charged. Proof may be circumstantial. Participation and acquiescence can be established from conduct as well as spoken words.
Now, the mere presence of an individual at a scene or near the scene of a crime, if that presence has been proved beyond a reasonable doubt, it does not make a person a participant in the crime, nor does the failure of a spectator to interfere make him a participant in the crime. The State must show beyond a reasonable doubt and prove to you beyond a reasonable doubt the presence and participation of an individual as an aider and abettor.
Clearly, the jury in this case was merely told that to be convicted as an aider or abettor a defendant must participate "as an aider and abettor" or act "in consort" with the principal. We conclude that this definition failed to inform the jury adequately that an aider or abettor of the crime of attempted murder must possess the same intent as the foiled murderer. Since the charge did not adequately instruct the jury that they must find a community of purpose between *175 the actual perpetrator and the aider and abettor, the trial court committed reversible error.

IV

The prosecutor's remarks in summation
During his summation the prosecutor[1] aggressively and recklessly insisted on making numerous improper remarks. He unfairly attempted to sway the jury to his side and prejudice them against defendants by saying, "My client by the way is not the State as I see it, it's the people of the County, you people, it's every person in this courtroom." In addition he made comments about defense tactics that reflected a personal enmity which he should not have expressed to the jury. See State v. Driver, 38 N.J. 255, 291 (1962). The prosecutor also endeavored to testify to facts not in the record. Although he was stopped twice by sustained objections, the prosecutor persisted in his efforts and finally managed to make an unproved, damaging statement to the jury that if the victims had identified any suspects besides defendants "you would have heard about them. * * * [I]f there were other ones [identifications], and there were not, cross-examination could have brought that out, if there were, but there were not." See State v. Farrell, 61 N.J. 99, 102-103 (1972). The prosecutor implied to the members of the jury that they would be guilty of cowardice if they voted for acquittal, saying, "If you don't have the courage, ladies and gentlemen, then you must acquit them." Furthermore, he intimated that defendants were a pack of wolves and implied falsely that they had mugged an old man they were seen with on the night of the shooting.
The prosecutor's most outrageous comments were those which implied that the three defendants had a duty to testify. As the transcript reveals, the prosecutor said:
*176 Now, with respect to Patrolman Alexander on page 161, he identified the three individuals. Of course Mr. Turner didn't want him to go over and look his defendant in the eye because this is what it's about, facing the accuser. And, did you see the reactions when they were pointed out by Walsh? Not one of them had the guts to look Walsh in the eye, not one of them said, "You're lying."
Although the court sustained an objection to this remark, the jury was not admonished to ignore it, and we are not at all persuaded that the prejudicial impact of the prosecutor's comments on defendants' Fifth Amendment rights was effectively mitigated. See State v. Bogen, 13 N.J. 137, 142, cert. den. 346 U.S. 825, 74 S.Ct. 44, 98 L.Ed. 350 (1953). In any event, even after the objection was sustained, the prosecutor persisted: "Walsh walked right over to them and pointed at them and looked them right in the eye and they didn't return it." The prosecutor's comments were tantamount to a denial of the right of the defendants to remain silent. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); State v. Spano, 64 N.J. 566 (1974); State v. Sinclair, 49 N.J. 525, 548-549 (1967). As said in Spano, the prosecutorial excess here "is simply inexcusable." 64 N.J. at 568.
Surely a prosecutor is entitled to sum up the State's case graphically and forcefully, but it is equally true that
Canon 5 [now embodied in DR 7-106(c)] of the Canons of Professional Ethics sets forth this function: "The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done." The canon summarizes Mr. Justice Sutherland's words in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935).
"The * * * [prosecuting] Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor  indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his *177 duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." [State v. Spano, supra, 64 N.J. at 568-569]
A reversal in a long and important case with the necessity of a retrial is costly in time, money and effort. It is undoubtedly disappointing to the prosecutor involved. However, although the prosecutor may strive to convict in the interest of justice, he should strive equally to attain that conviction by conduct which avoids the very errors which necessitate a reversal. The prosecutor in this case must bear his share of the responsibility for the reversal and remand which justice demands.

Conclusion
The convictions of all defendants are reversed and a new trial is ordered in accordance with the views herein expressed.
NOTES
[1] Lest there be unfounded and unfair reflection on the present prosecutor's staff in the county involved, we note that the prosecutor who tried this case is no longer associated with that office.