212 N.J. Super. 582 (1986)
515 A.2d 1246
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RANDY LEE GELB, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 9, 1986.
Decided September 25, 1986.
*583 Before Judges MICHELS and O'BRIEN.
Lorane Posner argued the cause for appellant (Brown and Brown, attorneys; Alan Dexter Bowman and Raymond Miller Brown, of counsel; Lorane Posner, on the brief).
Steven Pasternak, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General of New Jersey, attorney; Steven Pasternak, of counsel and on the letter brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Tried to a jury, defendant Randy Lee Gelb was convicted of (1) aggravated manslaughter, a crime of the first degree, in violation of N.J.S.A. 2C:11-4a (Count One); (2) aggravated assault, a crime of the second degree, in violation of N.J.S.A. 2C:12-1b(1) (Count Two); (3) criminal mischief, a crime of the third degree, in violation of N.J.S.A. 2C:17-3a(2) (Count Three) and (4) recklessly causing widespread injury or damage, a crime *584 of the third degree, in violation of N.J.S.A. 2C:17-2b (Count Four). The trial court sentenced defendant to an indeterminate term, not to exceed five years, at the Youth Reception and Correction Center at Yardville for the aggravated manslaughter (Count One) and to three additional indeterminate terms for the other convictions (Counts Two, Three and Four), which terms were to be served concurrently with the sentence imposed for his conviction for aggravated manslaughter. The trial court also imposed penalties totaling $100, payable to the Violent Crimes Compensation Board. Defendant appeals.
Defendant seeks a reversal of his convictions and a new trial on the following grounds set forth in his brief:
I. THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT ANY ENCOURAGING COMMENTS UTTERED BY APPELLANT MUST HAVE BEEN MADE PRIOR TO THE IRREVERSIBLE ACCOMPLISHMENT OF THE ACT IN ORDER TO RENDER HIM LIABLE AS AN ACCOMPLICE.
II. THE STATEMENT OF JULY 8, 1982 WAS INVOLUNTARILY COERCED AND TAINTED BY STATEMENTS MADE PRIOR TO THE INVOCATION OF MIRANDA RIGHTS. THEREFORE THE DENIAL OF THE MOTION TO SUPPRESS THAT STATEMENT WAS ERRONEOUS.
We have carefully considered these contentions and all of the arguments advanced by defendant in support of them and find that they are clearly without merit. R. 2:11-3(e)(2).
However, some further comment is necessary with respect to defendant's claim in Point I, infra, that the trial court committed reversible error by refusing to instruct the jury that if he "performed some act designed to aid, abet or incite the commission of [a] crime subsequent to the actual and irreversible lifting of the switch, it would be impossible for him to have participated in the offenses set forth in the indictment." The thrust of defendant's argument is that he could not aid or abet a completed act, and therefore the jury should have been instructed that "criminal intent, absent active and effective participation with influence over the outcome of the events, is an insufficient basis for [a finding of accomplice] liability." In defendant's view, the absence of such an instruction was erroneous *585 and denied him a fair trial. We disagree and affirm defendant's convictions.
As a result of a train derailment which occurred in the Borough of Fair Lawn, New Jersey, on July 7, 1982, defendant, together with Peter Wade (Wade) and Peter Benton (Benton), was indicted by the Bergen County Grand Jury and charged with aggravated manslaughter, aggravated assault, criminal mischief and recklessly causing widespread injury or damage to the property of Conrail and the property of A. Zerega and Sons. Wade and Benton subsequently entered into plea agreements with the State. Defendant, however, denied guilt and stood trial.
The proofs at trial established that during the summer of 1982, defendant and a group of his friends were in the habit of "hanging out" along the Conrail railroad tracks which ran behind defendant's house in Fair Lawn. In late June, the group moved the location of their meeting spot to an area near a railroad switch, which was located alongside the tracks. This switch was designed to change the tracks so that a train could be directed from the main line track to an industrial siding track running alongside the A. Zerega and Sons pasta factory. When the handle on this switch was moved, it would activate a red signal light located approximately twenty-five feet from the intersection of the railroad tracks and Morlot Avenue. Facing north, the signal light alerted trains coming from that direction that the switch was opened; however, the signal light was not visible from the switch area.
On Monday evening, July 5, 1982, defendant, Kevin Held (Held), Benton, Wade and George Yannitsadis (Yannitsadis) met at their usual "hang out" near the railroad switch. Held was angry on that night, and, at some point during the evening, he began striking the lock on the switch with a railroad spike in order to break it. After the lock was dislodged, Held moved the switch from its original position. In turn, defendant and Wade also moved the switch. By "testing" the switch in this *586 manner, the boys ascertained that the switch controlled the tracks and direction in which a train would go.
During the course of this activity, it was mentioned that, when the switch was thrown, an oncoming train would leave the main track and be transferred to the siding track which ran alongside the factory buildings. It was defendant's recollection that during this conversation, on Monday, July 5, 1982, he mentioned to his companions that there was a signal light on the tracks, near the Morlot Avenue intersection, which he believed had "something to do with the switch." Defendant further testified that, during the remainder of the evening, the boys did not have any discussions regarding future plans to throw the switch.
Defendant next returned to the area of the railroad tracks near the switch during the early evening hours on Wednesday, July 7, 1982. He met Held there and they were later joined by Wade, Benton and Yannitsadis. Shortly thereafter, Stuart Shapiro (Shapiro) and David Herstein (Herstein) also joined the group. At approximately 7:40 p.m., defendant, Shapiro and Benton left the area to purchase beer at a local liquor store. Upon their return, the group consumed at least five six-packs of beer in the area around the switch and smoked marijuana.
It was defendant's testimony that he did not go to meet his friends on Wednesday night with any intentions regarding the railroad switch. Furthermore, he did not recall any conversation about throwing the switch during the evening of July 7, 1982. However, Herstein testified that during the evening he heard a conversation between defendant and Benton about the fact that the switch lock had been broken on Monday night. During this conversation, Benton told defendant and Herstein that "they [were] going to switch the tracks."
At approximately 8:40 p.m., defendant and Herstein left the area to go to defendant's house to pick up a stereo tape. Wade recalled that defendant returned fifteen to twenty minutes before the train was seen. It was Herstein's recollection that, *587 after he and defendant returned from their walk to the house, Benton, Wade, Held and defendant were hovering around the switch. Wade further testified that the headlight of a train approaching from the direction of Morlot Avenue was first seen by the group at approximately 9:30 p.m. As the train got closer, those individuals who were sitting on the tracks or on nearby chairs got up and moved. Shortly thereafter, Wade recalled that Held yelled, "Throw the switch." After hearing this, Wade began pulling on the switch. He maintained that he had no intention of doing this before Held made his statement. Wade further testified that, after he had begun pulling the switch handle, he heard defendant yell to him "to wait until the train passed Morlot Avenue so the engineer doesn't know the switch is pulled." This statement was made within a few seconds of Held's comment that the switch should be thrown.
Although Wade was not aware of whether the train had passed Morlot Avenue at the time defendant's comment was made, it was Benton's recollection that the train was well past Morlot Avenue when Wade first began pulling the switch. After Wade heard defendant's comment, he let go of the switch. However, as he was releasing it, Benton reached across and pulled the switch handle the rest of the way down. Thereafter, defendant and his companions ran from the area.
Conrail Train 1164, a passenger line embarking from Suffern, New York, had experienced no mechanical difficulties and had arrived timely at each of its first two scheduled stops on the evening of July 7, 1982. However, at some time between 9:00 p.m. and 10:00 p.m., after passing the Morlot Avenue intersection, the train left the main railroad tracks, proceeded along the industrial siding tracks and slammed into a brick wall at the A. Zerega and Sons factory on Zinc Avenue. As a result of this impact, three quarters of the cab car of the train entered the factory building and all six cars and the engine were derailed.
An inspection of the area, made after the derailment, revealed that the switch controlling the side tracks at the Zerega factory had been moved to a locked position. In this position, a *588 train coming along the main tracks would have been led onto the siding tracks. Additionally, after the derailment, the signal light on Morlot Avenue was found to be operative and showing a red light.
As a result of the derailment of Train 1164 on July 7, 1982, Conrail engineer Jack Duffy suffered a laceration of the brain, causing his death. Joseph Sandora, a passenger on the train, suffered a ruptured spleen, a concussion, a collapsed lung and multiple abrasions and lacerations to the face. Furthermore, the A. Zerega and Sons manufacturing operation incurred damages totaling $1,750,000 due to the train's crashing through the factory building and Conrail suffered equipment damages amounting to $3,500,000.
In considering the propriety of the trial court's refusal to instruct the jury in the manner requested by defendant, it must initially be recognized that proper and appropriate charges are essential to a fair trial. State v. Green, 86 N.J. 281, 287 (1981). Before the jury begins its deliberations, the trial court must explain to the jury "its function in relation to the legal issues involved." Ibid. Thus, the trial court has a mandatory duty to charge the jury with respect to the fundamental principles of law which are applicable to the facts in a given case. State v. Fair, 45 N.J. 77, 90 (1965). Our Supreme Court has recognized that "[t]his requirement of a charge on [all] fundamental matter[s] is more critical in a criminal case when a person's liberty is at stake." State v. Green, supra, 86 N.J. at 289.
In dealing with requests to charge, in the context of a trial court's obligation to instruct the jury, the Supreme Court in State v. Green, supra, stated:
The function of a request to charge is to draw from the court a declaration of the law, coupled with an instruction to the jury on how it is to be applied by them in reaching a conclusion upon the issues before them. (Citation omitted). Requests for jury instructions may be classified into three levels of importance: (1) those concerning essential and fundamental issues; (2) those concerning substantially material matters; and (3) all other relevant and material subjects.
The court should instruct the jury with respect to requests involving essential and fundamental issues and those dealing with substantially material points. *589 See Wild v. Roman, 91 N.J. Super. 410, 413-414 (App.Div. 1966). Requests for instructions regarding such matters should be honored.... When the subject matter of the request does not fall within the first two categories ... then the trial court may exercise broad discretion on whether to grant the request. Guidelines of relevancy and materiality should be observed in exercising that discretion. [86 N.J. at 289-290].
Moreover, a request to charge must state a correct principle of law in order for its denial to be error. State v. Blecker, 155 N.J. Super. 93, 102 (App.Div. 1978). Where a portion of a request to charge contains an erroneous statement of law, the trial judge is justified in rejecting the charge, as a whole. Similarly, a request containing "an abstract principle of law without any instruction to the jury as to its applicability to the case" is also subject to denial. Altieri v. Public Service Railway Co., 103 N.J.L. 351, 353 (E.& A. 1927).
In instructing the jury on applicable principles of law:
[t]he court need not charge in the exact language requested provided the subject matter of the request has been fully and correctly covered, nor has the defendant the right to choose the language in which the court should state the pertinent instructions. (Citations omitted). [State v. Ellrich, 10 N.J. 146, 154 (1952)].
Accordingly, if the subject matter contained in the request to charge "is adequately covered in the text and purport of the whole charge, no prejudicial error comes into existence." State v. Thompson, 59 N.J. 396, 411 (1971). See Kaplan v. Haines, 96 N.J. Super. 242, 251 (App.Div. 1967), aff'd o.b., 51 N.J. 404 (1968).
Therefore, in considering whether defendant was prejudiced by the trial court's refusal to charge, as requested, this court must review the charge in its entirety, under the applicable principles of law. Reversal of a conviction will be warranted only if the instruction, taken as a whole, proves to be misleading or prejudicially ambiguous. State v. Hipplewith, 33 N.J. 300, 317 (1960). See also State v. Brown, 46 N.J. 96, 101 (1965).
To evaluate the propriety of the trial court's refusal to charge, this court must first determine whether the jury instruction requested by defendant stated a correct principle of *590 law relating to accomplice liability; it is not incumbent upon a trial court to give any requested instruction which contains an erroneous or improper legal statement. See State v. Green, supra, 86 N.J. at 291 (citing 75 Am.Jur.2d, Trial, § 590 at 571-572). Under the New Jersey Code of Criminal Justice (Code), a defendant may be guilty of an offense "if it is committed ... by the conduct of another person for which he is legally accountable...." N.J.S.A. 2C:2-6a. A defendant is deemed to be legally accountable for the conduct of another when "[h]e is an accomplice of such other person in the commission of an offense...." N.J.S.A. 2C:2-6b(3).
The Code further provides that:
c. A person is an accomplice of another person in the commission of an offense if:
(1) With the purpose of promoting or facilitating the commission of the offense; he
(a) Solicits such other person to commit it;
(b) Aids or agrees or attempts to aid such other person in planning or committing it; or

(c) Having a legal duty to prevent the commission of the offense, fails to make proper efforts so to do.... [N.J.S.A. 2C:2-6c(1)(a), (b), (c) (Emphasis supplied)].
These Code provisions were substituted for the previous complicity standard contained in Title 2A, which provided:
Any person who aids, abets, counsels, commands, induces or procures another to commit a crime is punishable as a principal. [N.J.S.A. 2A:85-14, repealed by L. 1978, c. 95, § 2C:98-2, effective September 1, 1979].
In interpreting this now-repealed statute, this court explained that, "[a]s used in the statute the word `aid' means to assist, support or supplement the efforts of another, and the word `abet' means to encourage, counsel, incite or instigate the commission of a crime." State v. Newell, 152 N.J. Super. 460, 469 (App.Div. 1977). Thus, under the prior statute our courts required that the aider and abettor share the same criminal intent as the one who actually committed the offense. State v. Madden, 61 N.J. 377, 396-397 (1972); State v. Sullivan, 43 N.J. 209, 236-237 (1964), cert. den., 382 U.S. 990, 86 S.Ct. 564, 15 L.Ed.2d 477 (1966); State v. Fair, supra, 45 N.J. at 95. Moreover, the courts further recognized that there must have been a *591 "community of purpose between the actual perpetrator [of the crime] and the aider and abettor." State v. Sims, 140 N.J. Super. 164, 174-175 (App.Div. 1976).
This view of accomplice liability, grounded on evidence of shared intent, has been accepted by those courts which recently have considered the complicity provisions of the Code contained within N.J.S.A. 2C:2-6. See e.g., State v. White, 98 N.J. 122, 129 (1984) (for both the accomplice and his partner to be guilty they must have shared in the intent which is the crime's basic element); State v. Nunez, 209 N.J. Super. 127, 131 (App.Div. 1986) (substantial evidence of shared intent warrants accomplice instruction). See also II The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission 57 (1971) (noting that N.J.S.A. 2C:2-6c, defining an accomplice, does not differ markedly from prior statute, N.J.S.A. 2A:85-14). Furthermore, the New Jersey Criminal Law Revision Commission, which drafted the Code, has commented that the term "accomplice" should be "employed as the broadest and least technical [term] available to denote criminal complicity." Ibid.
Hence, for defendants to be found guilty of a crime under a theory of accomplice liability:
it is essential that they shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act. Mere presence at the scene of the crime, however, is insufficient to render a defendant guilty. [State v. Fair, supra, 45 N.J. at 95 (Emphasis supplied)].
There must be "an actual participation  an aiding and abetting in the crime committed." (State v. Fox, 70 N.J.L. 353, 355 (Sup.Ct. 1904)). However,
[a]lthough mere presence at or near the scene of the crime, or the failure to intervene, does not make one a participant in the crime, presence at the commission of a crime without disapproving or opposing it is evidence which, in connection with other circumstances, permits the inference that he asserted [sic] thereto, lent to it his countenance and approval, and was thereby aiding and abetting the same. [State v. Newell, supra, 152 N.J. Super. at 469 (Emphasis supplied) (citing State v. Smith, 32 N.J. 501, 521 (1960), cert. den., 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367 (1961)].
Concerted action need not be proved by direct evidence of a formal plan to commit a crime, which was verbally agreed to by *592 all who were charged. Rather the proof may be circumstantial and participation and acquiescence may be inferred from conduct, as well as spoken words. State v. Smith, supra, 32 N.J. at 522.
Our Supreme Court has held that an accomplice may be guilty of armed robbery, even though he did not personally possess or use the firearm in the course of a robbery "if the accomplice had the purpose to promote or facilitate th[e] crime." State v. White, supra, 98 N.J. at 130. In addition, accomplice liability has been found: (1) for the commission of a battery in the absence of evidence that defendant actually wielded the stick or club, State v. Riley, 28 N.J. 188, 196-197 (1958), app. dism., 359 U.S. 313, 79 S.Ct. 891, 3 L.Ed.2d 832 (1959); (2) where a defendant merely directed a woman to a third party in order to secure an abortion, State v. Ellrich, supra, 10 N.J. at 150; and (3) for cheating and defrauding by false pretenses, even though defendant did not actually tamper with electrical meters. State v. Cox, 150 N.J. Super. 599, 604 (Law Div. 1977), aff'd o.b., 160 N.J. Super. 28 (App.Div. 1978).
The present complicity statute itself provides that a defendant may be guilty of an offense, as an accomplice, if, with the intention of promoting or facilitating the commission of a crime, he "[a]ids or agrees or attempts to aid" another person in committing it. N.J.S.A. 2C:2-6c(1)(b) [Emphasis supplied]. Thus, by the very terms of the statute, accomplice liability will attach if an individual merely attempts to aid in the commission of a crime; such an attempt need not actually facilitate the commission of the offense to support a finding of liability. As recognized by the New Jersey Criminal Law Revision Commission:

The Code includes in § 2C:2-6c(1) not only those who command, request, encourage, provoke or aid but also those who agree or attempt to aid in the planning or execution. It also includes one who has a legal duty to prevent the crime who fails to make proper effort to do so. This represents an exhaustive description of the ways in which one may purposely enhance the probability that another will commit a crime. There being a purpose (i.e., a *593 "specific intent") to further or facilitate, there is no risk of innocence. [II The New Jersey Penal Code: Final Report of the New Jersey Law Revision Committee, supra, at 59 (Emphasis supplied)].
N.J.S.A. 2C:2-6 imposes accomplice liability whenever an intention to further or facilitate a crime is found, regardless of the fact that such an intention may have manifested itself in an incomplete "attempt to aid." Yet, implicit in defendant's request to charge is the proposition that if the switch was thrown prior to the moment when his alleged statement was made, he could not be found to have aided in the train derailment. A charge grounded on this proposition, however, completely ignores the intent requirement and does not accurately state the law.
Accordingly, we hold that the trial court properly declined to charge the jury with respect to accomplice liability in the form and language requested by defendant. The jury instruction by the trial court fully explained the role of an accomplice and his liability for the crimes charged in clear and concise language. In our view, the charge as a whole was adequate and legally correct, and there was no need to supplement the charges as requested by defendant.
Affirmed.