240 N.J. Super. 352 (1990)
573 A.2d 475
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MARY ANN MAIORANA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted March 5, 1990.
Decided April 24, 1990.
*354 Before Judges PETRELLA, O'BRIEN and HAVEY.
Beattie Padovano and Dunn, Pashman, Sponzilli, Swick & Finnerty, attorneys for appellant (Roger Breslin, Jr., of counsel; Robert E. Rochford, on the brief).
Robert J. Del Tufo, Attorney General, attorney for respondent (Robin Parker, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by O'BRIEN, J.A.D.
Defendant Mary Ann Maiorana appeals from her conviction of misconduct in office (N.J.S.A. 2C:30-2), upon which she was sentenced to a term of three years. She was acquitted of theft by deception. She also appeals from denial of her motion to dismiss count two of the indictment which is reported as, State v. Maioranna, 225 N.J. Super. 365, 542 A.2d 510 (Law Div. 1988). We affirm denial of the motion to dismiss the indictment and the conviction, subject to the result of a hearing pursuant to Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and State v. Strong, 110 N.J. 583, 596, 542 A.2d 866 (1988), for which the matter is remanded.
The United States Department of Housing and Urban Development (HUD) made block grants to Bergen County to be used *355 for various county and municipal projects. The Bergen County Community Development Office served as the agency through which the HUD funds were disbursed. In early 1987, the Community Development Office employed approximately 45 people to administer approximately $9,000,000 in annual HUD grants. Defendant became director of the Community Development Office in January 1984.
Codefendant Charles Oglesby[1] was employed by the County Community Development Office from September 1981 until January 1986, holding various job titles and progressing from a "cost estimator" to an "assistant planner." In the latter capacity, Oglesby was assigned to monitor community development activities (including the expenditure of grant monies) for approximately ten municipalities in the central region of Bergen County, including the Township of Saddle Brook. For about two years before Oglesby left the employ of the Community Development Office, he had defendant engaged in a romantic affair. Allegedly in January 1986 that relationship ended when Oglesby began living with another woman.
After Oglesby resigned his position with the county, he was appointed by Peter LoDico, the Mayor of Saddle Brook, as the mayor's alternate to the Central Bergen Regional Community Development Council, an unsalaried position. After January 1986, defendant had no further social contact with Oglesby although they met occasionally at meetings of the Regional Community Development Council, which he attended as alternate for the mayor of Saddle Brook and she attended as part of her official duties. Oglesby was elected to serve as the vice-chairman of the regional council and regularly reported back to Mayor LoDico on Regional Council Community Development matters.
*356 In 1983, a $25,000 grant had been allocated to Saddle Brook for a study of the revitalization of the town's central business district. At the Regional Community Development Council meetings, numerous references were made to the failure of Saddle Brook to utilize that grant. In approximately September 1986, Oglesby reported to Mayor LoDico that requests were being made for status reports on the use of the $25,000 planning grant. By letter of September 30, 1986, the mayor informed defendant that the business district revitalization study and another community development matter relating to "Market Street channelization" were interrelated and taking more time than expected. In his letter, the mayor said to defendant:
Township engineer is in the process of working with the county since Market Street is a county road to obtain their input on plans, once this is approved we should be able to move quickly. The business district study is in the process and report should be forthcoming at a future date.
At trial, the mayor conceded that there was no study nor were there any reports in progress at that time.
Oglesby asked the mayor to appoint him to do the feasibility study of Market Street. The testimony was conflicting as to whether the mayor actually appointed Oglesby to do the study. Oglesby said he had been appointed. The mayor claimed he requested Oglesby to furnish "a proposal" for the study, which he never received, but he did not enter into a contract with Oglesby to perform the study. In any event, in November 1986, Oglesby told the mayor the town had "to show some sort of movement" on the grant and presented the mayor with an official voucher for $15,000 of the $25,000 grant for the central business revitalization study to be transferred to a Saddle Brook account. The mayor signed the voucher on November 25, 1986, and forwarded it to defendant at the County Community Development Office. The voucher stated that the money was to pay for a "preliminary draft." When this voucher was received at the County Community Development Office, defendant countersigned it, and forwarded it to the county treasurer's office. She advised an assistant accountant in the county treasurer's office to begin the process of obtaining the HUD *357 monies from the federal account, but not to authorize transfer of the $15,000 until the necessary backup paper work was received from Saddle Brook.
Ultimately, the $15,000 was transferred to Saddle Brook in December 1986. At that time and in January 1987, Oglesby submitted two municipal vouchers to the municipality payable to him, one in the amount of $7,500 and the other in the amount of $10,000, which the mayor and the municipal treasurer refused to process.
On January 22, 1987, Oglesby came to defendant's office with a $10,000 voucher payable to him for the central business district revitalization study in Saddle Brook. This voucher contained a certification by Oglesby that the work involved had been completed. Defendant told Oglesby that the voucher could not be processed until she had something from the township to show his appointment to do the study. Using the telephone in defendant's office, Oglesby called the Saddle Brook town clerk, relaying his need for a letter confirming that he had been appointed to perform the study. When he hung up, Oglesby informed defendant she would be receiving the letter and left, leaving the voucher with her.
On the following day, January 23, 1987, Oglesby went to the municipal building in Saddle Brook and asked to speak with the mayor. He told the town clerk he wanted to speak to the mayor about obtaining the letter he needed regarding the study. Since the mayor was not in the office, the clerk telephoned him at his work place. She gave the telephone to Oglesby, who spoke directly to the mayor. When the clerk got back on the telephone, the mayor instructed her to prepare the letter and to coordinate with Oglesby as to its wording. The town clerk typed a letter, addressed to defendant as director of the Community Development Office, stating that the mayor had appointed Oglesby to prepare the central business district revitalization *358 study. Later that day the mayor signed the letter.[2] A few days after the letter was prepared, the town clerk told Maiorana that Oglesby was supposed to pick up the executed letter but had not done so. Maiorana asked the clerk to send the letter directly to the Community Development Office. It was delivered the next day, January 27, 1987.
When defendant learned that the letter of appointment from the mayor was on its way, she signed the voucher but held it until the mayor's letter was received on January 27, 1987. She attached the other documents to it, logged in the freeholder resolution date, made a copy of all the documents and placed it on the desk of one of her assistants for processing. The account clerk was uncertain whether to process the matter because the voucher was a copy rather than the "green" original, and because the voucher was signed by Oglesby rather than by the mayor. Defendant instructed the account clerk to post the paper and it was processed in the usual way. Although the account clerk testified that it normally takes about ten days for a voucher to be paid, the $10,000 check to pay Oglesby's voucher was issued on January 28, 1987, as the paper work was hand carried to the county treasurer's office at defendant's direction.
On January 28, 1987, an assistant accountant in the treasurer's office, called defendant to say he had earlier given Oglesby a check for $10,000 payable to Saddle Brook, but that Oglesby had returned and requested that it be replaced with a $10,000 check payable to him. Defendant told the accountant that the check should be made payable to Oglesby because it was he who had applied for payment and signed the voucher certifying *359 that the work had been performed. Defendant claimed that direct payment to an unpaid vendor was not unusual and that a municipal resolution was not required where there was documentary authorization from the town designating the vendor, which she considered the mayor's letter of January 23, 1989 to be. Oglesby cashed the $10,000 check at the drawee bank on January 28, 1987, depositing $4,000 in an account with that bank. All of those funds were withdrawn by February 19, 1987.
In late February 1987, the mayor telephoned defendant to ask whether Oglesby had been paid for a study. She explained to the mayor that Oglesby had submitted a voucher and had assured her the study had been submitted to the mayor. When the mayor told defendant he had not received the study, she wrote a letter to Oglesby dated February 24, 1987, which read as follows:
Dear Charles:
On January 27, 1987 you received check number 24188 in the amount of $10,000 for services rendered to the Borough of Saddle Brook in connection with the above captioned project. The Mayor has advised me that he was unaware that these funds had been expended. He further advised that he was waiting for a report from me on work completed to date which you advised him you submitted to me. Inasmuch as neither the mayor nor I have your report on work completed and further since you have been paid for work which you certify to be done, please forward documentation of the completed study within 15 days of receipt of this letter.
On March 2 or March 3, 1987, a council member in Saddle Brook, found in her mailbox a copy of vouchers and the letter from the mayor appointing Oglesby to do a study of Market Street in Saddle Brook. The next day, she went to the prosecutor's office to request an investigation.[3]
The investigation by the Bergen County prosecutor's office culminated in a series of witnesses being presented to the grand jury on December 14 and December 21, 1987. After a *360 further session on December 28, 1987, an indictment was returned by the grand jury on January 4, 1988, charging both defendant and Oglesby in the first count with theft by deception (N.J.S.A. 2C:20-4), and charging defendant in the second count with official misconduct (N.J.S.A. 2C:30-2).
Specifically, the second count of the indictment charges that defendant:
... did commit official misconduct when, as the Director of the Bergen County Community Development Program, with purpose to obtain funds belonging to the Township of Saddle Brook and the Bergen County Community Development Program for the benefit of CHARLES OGLESBY, committed acts relating to her office but constituting an unauthorized exercise of her official functions knowing such acts to be unauthorized, to wit:
1. She approved the payment of $10,000 in funds designated for the benefit of the Township of Saddle Brook to CHARLES OGLESBY without the necessary consent of the governing body of the Township of Saddle Brook;
2. She authorized this payment of funds for a written study to be performed by CHARLES OGLESBY without having first received such study, contrary to Bergen County Community Development procedure;
3. She authorized payment of a $10,000 check directly to CHARLES OGLESBY rather than to the Township of Saddle Brook, contrary to the Bergen County Community Development procedure; contrary to the provisions of N.J.S.A. 2C:30-2 and against the peace of this State, the government and dignity of the same.
Both defendant and Oglesby had been called as witnesses before the grand jury. Prior to defendant's appearance, she was presented with a waiver of immunity in the anteroom outside the presence of the grand jury. She was accompanied by her attorney who noted that her appearance was compelled by the provisions of N.J.S.A. 2A:81-17.2a1, and she asserted her privilege against self-incrimination. The assistant prosecutor advised her:
Nothing  under these circumstances, nothing you say then can be used against you in further criminal proceedings. Do you understand that?
She then executed a form indicating her assertion of her privilege. This was placed on top of the waiver of immunity form and reads as follows:

*361 December 14, 1987
Pursuant to the provisions of N.J.S.A. 2A:81-17a(2) I hereby assert and claim my privilege against self-incrimination provided by law in connection with my testimony before the grand jury in this matter.
It was agreed between counsel that the grand jury would not be advised of her assertion of her privilege. She thereupon testified before the grand jury.
Defendant moved to dismiss count two of the indictment pursuant to R. 3:10-2 or 3:10-3 on the grounds that it failed to charge an offense and that the evidence was insufficient to warrant the return of an indictment. The motion was supported by defendant's affidavit, in which she alleges that a memorandum entitled "Payment Procedure for Community Development Projects" which had been issued over her signature to municipal clerks/administrators, treasurers and agencies, a copy of which had been received in evidence before the grand jury, was never
... formally approved or adopted by the Bergen County Board of Chosen Freeholders, nor have any rules or regulations ever been adopted by the Board of Chosen Freeholders, or any other federal or state governmental agency, mandating procedures to be followed by the Bergen County Community Development office in the administration of municipal community development projects....
She claimed that the procedures contained in the memorandum were in-house guidelines to be followed by municipal officials, and thus it could not be said that she violated procedures as alleged in the indictment. Defendant's motion was denied on April 4, 1988.
On this appeal, defendant raises the following legal arguments:
POINT ONE: A COUNTY OFFICIAL DOES NOT COMMIT MISCONDUCT IN OFFICE PURSUANT TO N.J.S.A. 2C:30-2 BY DEVIATING FROM INTERNAL OFFICE PROCEDURES GOVERNING MUNICIPAL EMPLOYEES AND AGENCIES. [Emphasis in original.]
POINT TWO: DEFENDANT'S CONVICTION IS FATALLY TAINTED BY PROSECUTORIAL ACCESS TO, AND USE AGAINST HER, OF HER IMMUNIZED TESTIMONY BEFORE THE GRAND JURY OBTAINED BY COMPULSION (Not Raised Below).
POINT THREE: THE JURY WAS NOT PROPERLY INSTRUCTED AS TO THE MISCONDUCT IN OFFICE CHARGE (Not Raised Below).

*362 POINT FOUR: THE CHARGES TRIED BELOW VARIED FATALLY FROM THE INDICTMENT RETURNED BY THE GRAND JURY.
POINT FIVE: THE TRIAL COURT IMPROPERLY FAILED TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE CONTAINED IN N.J.S.A. 2C:21-15 (Not Raised Below).

I. Denial of motion to dismiss count two of the indictment.
We affirm the denial of defendant's motion to dismiss count two of the indictment substantially for the reasons given by Judge Sybil R. Moses in her written opinion published as State v. Maiorana, supra.

II. Adequacy of jury charge.
Defendant claims the charge given by the trial judge[4] on misconduct in office under N.J.S.A. 2C:30-2 was inadequate. When construing statutes which prescribe the duties and obligations of public officials, it is a practical impossibility to spell out with specificity every duty of the office, and therefore courts take judicial notice of the duties which are inherent in the very nature of the office. State v. Deegan, 126 N.J. Super. 475, 492, 315 A.2d 686 (App.Div. 1974). We recognize, as did Judge Moses, that the language of the indictment generally tracks the language of subparagraph (a) of N.J.S.A. 2C:30-2, but the statutory reference in the indictment was not confined to that section. Regardless of the nature of the payment procedure for community development projects and its limited applicability, defendant had an inherent duty not to disburse grant monies in the absence of proper authorization and to a proper person. However, the proofs must support the conclusion that the acts were done with evil motive or in bad faith and not honestly. Mere negligence or honest mistake of judgment is not enough. See State v. Begyn, 34 N.J. 35, 50, 167 A.2d 161 (1961) (discussing common law misconduct in office, N.J.S.A. 2A:85-1). Defendant's contention that the mayor's letter constituted municipal authorization for the appointment of Oglesby *363 to perform the Business District Revitalization Study did not excuse her certification that the study had been performed, as certified by Oglesby in the voucher, nor did it support the authorization to pay the grant monies directly to Oglesby rather than to the municipality for disbursement to him. In any event, both those contentions and her further contention that, in the past, direct payments had been made to unpaid vendors, where there was documentary authorization from the town designating the vendor, were before the jury for their consideration.
We agree that the trial judge has a mandatory duty to charge the jury with respect to the fundamental principles of law which are applicable to the facts in a given case. State v. Gelb, 212 N.J. Super. 582, 588, 515 A.2d 1246 (App.Div. 1986), certif. den. 107 N.J. 633, 527 A.2d 456 (1987). Defendant did not request any particular charge to the jury, nor object to the charge as delivered, nor to the answer to the jury's question with respect to the misconduct in office charge. "... [N]o party may urge as error any portion of the charge to the jury or omissions therefrom unless he objects thereto before the jury retires to consider its verdict ...," in the absence of plain error. R. 1:7-2. In the absence of any requests to charge or objection to the charges as given, we find the trial judge's charge to the jury as to misconduct in office adequate.

III. Lesser included offense.
There is no merit to defendant's contention that the trial judge should have charged the jury on misapplication of entrusted property as a lesser included offense pursuant to N.J.S.A. 2C:21-15. Initially, defendant made no request for such a charge nor objected to the omission of such instruction from the charge. Thus, the issue must be addressed as one of plain error. R. 1:7-2; State v. Lane, 52 N.J. 123, 126, 244 A.2d 108 (1968).
In State v. Crisantos (Arriagas), 102 N.J. 265, 275, 508 A.2d 167 (1986), the Supreme Court noted that the decision to charge *364 a lesser included offense is governed by N.J.S.A. 2C:1-8(e), which provides, "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." The Court noted that, "[T]he rational-basis test of the Code imposes a low threshold ... for permitting a charge on a lesser-included offense." 102 N.J. at 278, 508 A.2d 167. Thus, it held that, "When the lesser-included offense charge is requested by a defendant ... the trial court is obligated, in view of defendant's interest, to examine the record thoroughly to determine if the rational-basis standard has been satisfied." Ibid; see also State v. Moore, 113 N.J. 239, 288-289, 550 A.2d 117 (1988). However, when there is no request to charge, the trial judge does not "have the obligation on its own meticulously to sift through the entire record ..." in every case to see if the facts and inferences might sustain a particular charge. State v. Choice, 98 N.J. 295, 299, 486 A.2d 833 (1985). It is only when the facts clearly indicate the appropriateness of that charge that the duty of the trial judge arises.
It is conceded that defendant did not receive any of the $10,000 obtained by Oglesby. The State's theory of the case was that defendant violated office procedures of the Community Development Office to benefit Oglesby because of her romantic attachment to him. Defendant argued, in her counsel's summation to the jury, that she was no longer interested in Oglesby's welfare in January 1987, and thus did not become his accomplice, but rather was duped by him and perhaps by the mayor. Thus, argues defendant, the trial judge had a duty to instruct the jury on the offense of misapplication of government property under N.J.S.A. 2C:21-15. We disagree. While defendant may have had a fiduciary relationship with respect to the grant monies, that was in her role as a public employee and not as a "fiduciary" as defined in the statute. Even if this statute does cover the circumstances in this case, as "apply[ing] or dispos[ing]" of "property belonging to or required to be withheld for the benefit of the government," the trial judge, in *365 the absence of a request to charge, had no duty to meticulously sift through the entire record to see if the facts and circumstances might sustain that charge. See State v. Choice, supra, at 299, 486 A.2d 833.

IV. Use of immunized testimony by the grand jury.
Defendant's contention that the indictment should be dismissed because it was returned by the same grand jury that heard her immunized testimony is without merit. In State v. Vinegra, 73 N.J. 484, 376 A.2d 150 (1977), the Supreme Court held that,
... the receipt by a grand jury of evidence obtained in violation of a person's Fifth Amendment rights does not infect an indictment based on such testimony.... [S]uppression of such grand jury evidence (and fruits thereof) at trial adequately protects a defendant's Fifth Amendment rights. [Id. at 490, 376 A.2d 150]
State v. Strong, 110 N.J. 583, 542 A.2d 866 (1988), has not overruled State v. Vinegra, as argued by defendant. In Strong, the defendant was given immunity pursuant to N.J.S.A. 2A:81-17.3 and testified before a grand jury where he acknowledged his own participation in the crime. Later, Strong testified for the State under the continuing grant of immunity and again incriminated himself. One year later, Strong was indicted by another grand jury. He moved to dismiss the indictment on the ground that it was based on evidence derived from his earlier compelled testimony, and thus violated his statutory immunity. The Court described use and fruits immunity as follows:
Under this form of immunity the State is barred from using compelled testimony or any evidence that was developed as a result of such testimony to prosecute a defendant who had given the compelled testimony, but it can use any evidence that is found or derived through means totally independent of the compelled testimony; and it may use such independently obtained evidence to prosecute a defendant even if the prosecution is for the same crime or criminal events that were the subject of the compelled testimony. [110 N.J. at 589, 542 A.2d 866]
If the Strong court had intended to overrule the conclusion of the Vinegra court, which held that a person may be indicted by the same grand jury who heard his immunized testimony, it *366 most certainly would have said so. The only reference in the Strong opinion to State v. Vinegra is to our opinion reported at 134 N.J. Super. 432, 341 A.2d 673 (App.Div. 1975), as an example of the broad guidelines for immunity situations served by Kastigar. There is no reference in Strong to the Supreme Court's opinion in Vinegra, affirming our decision, reported at 73 N.J. 484, 376 A.2d 150 (1977).

V. Failure to conduct a Kastigar hearing.
Defendant argues that the trial judge should have conducted a Kastigar hearing, as our Supreme Court required in State v. Strong, supra. Under use and derivative use immunity, when the State seeks to use evidence against a defendant relating to criminal acts or events that were the subject of earlier compelled testimony obtained from the defendant in exchange for immunity, the State must prove at a hearing by clear and convincing evidence that such evidence was developed or obtained from sources or by means entirely independent of, and unrelated to, the earlier compelled testimony. 110 N.J. 595-596, 542 A.2d 866. In our decision in State v. Vinegra, we agreed with the trial judge that the use/fruits immunity provided to a public employee under N.J.S.A. 2A:81-17.2a2 is self-executing and requires no assertion of the privilege by the witness and no confirmatory action by the court or by the State since it is the plain language of the statute. 134 N.J. Super. at 440, 341 A.2d 673; see also State v. Gora, 148 N.J. Super. 582, 600, 372 A.2d 1335 (App.Div. 1977). In affirming our decision in Vinegra, the Supreme Court repeated our admonition that protection of defendant's Fifth Amendment rights will require that the State, at trial, have the burden of proving that the evidence it uses is derived from legitimate sources wholly independent of defendant's grand jury testimony. 73 N.J. at 491-492, 376 A.2d 150. In this case, prior to her grand jury testimony, defendant asserted her Fifth Amendment privilege and was assured by the assistant prosecutor, "Nothing  under these circumstances, nothing you say then can be used against you in further criminal proceedings."
*367 Since defendant did not move for a Kastigar hearing, the State argues that she waived that right pursuant to R. 3:10-2, concerning defenses and objections which must be raised before trial or otherwise be deemed waived[5] in the absence of good cause shown. See State v. Del Fino, 100 N.J. 154, 495 A.2d 60 (1985). Even if defendant had an obligation to move for a Kastigar hearing before trial, which we do not pass upon, we conclude that good cause has been shown for relief from any waiver provided by R. 3:10-2.
The burden of proof is upon the State to establish clearly and convincingly that the evidence it proposed to present at trial was developed or obtained from sources or by a means entirely independent of and unrelated to the earlier compelled testimony. State v. Strong, supra, 110 N.J. at 596, 542 A.2d 866. Our review of the transcripts of both the grand jury proceedings and the trial reveals that most of the witnesses who testified before the grand jury also testified at trial. Thus, the knowledge of those witnesses, as reflected by their grand jury testimony, constituted evidence against defendant separate and apart from defendant's testimony before the grand jury. From that it appears the State may have had sufficient evidence of defendant's guilt of the charge, developed or obtained from sources, or by means entirely independent of, and unrelated to, her compelled testimony before the grand jury. At trial, no reference was made to defendant's earlier grand jury testimony, nor was that testimony used by the State in presenting its case.
However, the assistant prosecutor who tried the case was the same assistant prosecutor who presented the matter to the grand jury and who, upon defendant's exercise of her Fifth *368 Amendment privilege, assured her that she had the use/fruits immunity provided by the statute. Defendant argues that the trial prosecutor was in a position to exploit his prior interrogation of her before the grand jury, noting that the very dynamics of interaction between a questioner and a respondent can be of immense importance in effective presentation of a case at trial, citing Haydock and Herr, Discovery Practice (2d ed.), § 3.4 at 231 (1988). In taking what was, in effect, a "deposition" of defendant before the grand jury, the trial prosecutor was able to "assess defendant's demeanor to determine what type of trial witness she would be." Id. § 3.1 at 189.
Some cases have recognized that, where there is prosecutorial access to, or familiarity with, compelled testimony, such prosecutorial use for purposes of a later prosecution will be inferred, and a heavy burden of proof is placed upon the State to negate this inference of prosecutorial use. State v. Strong, 110 N.J. at 606, 542 A.2d 866. A similar heavy burden is placed on the State to show that its pretrial investigation of a crime was insulated from use of any compelled materials. Ibid. As in State v. Strong, the record in this case shows that the assistant prosecutor not only was directly exposed to defendant's immunized testimony, but may have made actual use of it in preparing the case against her.
In reinstating an order of the Mercer County Court compelling an immunized witness to testify before a grand jury, the Supreme Court in In Re Petition to Compel Testimony of Tuso, 73 N.J. 575, 376 A.2d 895 (1977), found its view
... buttressed by the precaution the State took in sealing and certifying the record of evidence it proposed to use at Tuso's trial and lodging it with the court; also by the plan to use a different Deputy Attorney General before Grand Jury No. 27 from the one assigned to try Tuso. [citation omitted] [73 N.J. at 581, 376 A.2d 895]
The substantial precautions taken by the State in Tuso suggests recognition of the inherent dangers in having the same prosecutor who examines an immunized witness before the grand jury thereafter prepare and try the case against that *369 witness on an indictment involving the same subject matter. This is precisely what occurred in this case. We therefore conclude, as in Strong, that the question of prosecutorial use of the compelled testimony in investigating, preparing and trying the case against defendant must be considered by the trial judge on remand.
Accordingly, the matter is remanded to the trial judge for a Kastigar hearing, at which the burden of proof will be upon the State to establish clearly and convincingly that the evidence adduced at trial against this defendant was developed or obtained solely from sources or by means entirely independent of and unrelated to her earlier compelled testimony before the grand jury. Furthermore, the trial judge shall ascertain the extent to which the prosecutor used the compelled testimony in investigating, preparing or trying the case against defendant. If, after the remand hearing, the trial judge concludes there has been a violation of the use/fruits immunity accorded to defendant pursuant to N.J.S.A. 2A:81-17.2a2, a new trial shall be ordered, if the State has adequate untainted evidence to proceed with the prosecution. If, on the other hand, the trial judge concludes that the prosecutor made no use of the compelled testimony in investigating, preparing and trying the case against defendant, and that the evidence used against her at trial was developed or obtained from sources or by means entirely independent of and unrelated to her earlier compelled testimony, her conviction is affirmed. We do not retain jurisdiction.
NOTES
[1] Codefendant Charles Oglesby was convicted of theft by deception (N.J.S.A. 2C:20-4). His appeal from that conviction is being decided by separate opinion which will be filed simultaneously with this opinion.
[2] At the trial, the mayor claimed he only signed the letter because Oglesby told him the grant money might otherwise be lost and that he did not intend the letter to authorize payment to Oglesby. Oglesby testified that the mayor knew on January 23 that he was trying to obtain a $10,000 payment on the voucher for the study and that the letter was prepared to facilitate that payment.
[3] The testimony revealed that the council member and the mayor were political opponents.
[4] Judge Moses was not the trial judge.
[5] The State notes that the assistant prosecutor who presented the matter both to the grand jury and at trial is now engaged in private practice and that "no doubt everyone's memory of the salient facts has faded," thus arguing that defendant's failure to make a motion militates in favor of the notion that she should be deemed to have waived this issue.