254 N.J. Super. 75 (1992)
603 A.2d 78
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
PAUL KAMIENSKI, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ANTHONY ALONGI, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
JOSEPH MARSIENO (MARZENO) A/K/A MICHAEL TESTA; ANTHONY ALONGI; AND PAUL KAMIENSKI, DEFENDANTS-RESPONDENTS. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH MARSIENO (MARZENO) A/K/A MICHAEL TESTA; ANTHONY ALONGI; AND PAUL KAMIENSKI, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 12, 1991.
Decided February 19, 1992.
*78 Before Judges J.H. COLEMAN, BILDER and STERN.
*79 Richard E. Mischel argued the cause for appellants-respondents, Paul Kamienski and Anthony Alongi (Greenberg, Margolis, attorneys; Richard E. Mischel on the brief for Paul Kamienski; Anthony Alongi filed a pro se brief).
Samuel J. Marzarella, Assistant County Prosecutor, argued the cause for respondent-appellant, State of New Jersey (James W. Holzapfel, Prosecutor of Ocean County, attorney; Samuel J. Marzarella, of counsel; Samuel J. Marzarella, Francis Rodman Rupp, Assistant County Prosecutor, on the brief).
Wilfredo Caraballo, Public Defender, attorney for appellant-respondent Joseph Marsieno (Marzeno), a/k/a Michael Testa (Kevin G. Byrnes, Designated Counsel, of counsel and on the brief).
The opinion of the court was delivered by COLEMAN, J.H., P.J.A.D.
These appeals raise two significant issues: (1) whether an unsequestered jury voir dire or the use of sequential rotation methodology in the exercise of peremptory challenges precluded a fair trial, and (2) whether an acquittal on a conspiracy to rob and to murder precluded a conviction on those substantive offenses as an accomplice. We hold that under the facts, the jury selection process did not preclude the impanelling of a fair and impartial jury. We also hold that where a jury is instructed properly, an acquittal under a theory of conspiracy does not as a matter of law preclude a conviction as an accomplice.
Defendants were tried jointly under a theory that they conspired and acted as accomplices in one or more schemes (1) to obtain cocaine with the intent to distribute it, (2) to rob the drug dealers of the cocaine rather than pay for it, and (3) to murder the drug dealers to avoid retaliation by drug lords. Each defendant was convicted of the five counts submitted to the jury. The trial judge granted judgments of acquittal notwithstanding the verdicts (j.n.o.v.) on three counts as to two of the defendants. The State has appealed from the j.n.o.v. and each *80 defendant has filed a separate appeal. We now consolidate the four appeals and issue a single opinion. We reverse the j.n.o.v., affirm the verdicts of the jury and reinstate those verdicts except that the two conspiracies must be merged into a single conspiracy and the felony murders must merge with the knowing or purposeful murders.

I. PROCEDURAL HISTORY
Defendants Paul Kamienski, Anthony Alongi and Joseph Marzeno were tried under five counts of Ocean County Indictment No. 692-10-87. Two additional counts charging only Marzeno with capital murders were dismissed approximately two months before the trial commenced. All three defendants were tried for the knowing or purposeful murders of Henry DeTournay and his wife Barbara DeTournay, contrary to N.J.S.A. 2C:11-3a(1) and (2) (Counts One and Two); felony murders[1] of Henry and Barbara DeTournay, contrary to N.J.S.A. 2C:15-1 and N.J.S.A. 2C:11-3a(3) (Count Five); conspiracy among the defendants between August 1, 1983 and April 30, 1984, in Ocean County and the State of Florida, to commit the crimes of possession of cocaine with intent to distribute, in violation of N.J.S.A. 24:21-19a, and/or robbery in the first-degree, in violation of N.J.S.A. 2C:15-1, and/or murder, in violation of N.J.S.A. 2C:11-3 and N.J.S.A. 2C:5-2, (Count Six); and conspiracy with each other, Henry and Barbara DeTournay and Sidney Jeffrey, II, who were unindicted co-conspirators, between August 1, 1983, and April 30, 1984, to possess cocaine with intent to distribute, contrary to N.J.S.A. 2C:5-2 and N.J.S.A. 24:21-19a(1) (Count Seven). The jury was asked to decide whether there were one or two conspiracies at one time or at different times.
*81 Marzeno was tried as the person who knowingly or purposefully caused the death of Henry DeTournay under Count One and Barbara DeTournay under Count Two. He was also tried for being the person who caused the deaths of the DeTournays during the commission of a robbery of cocaine under Count Five. Alongi and Kamienski were tried as accomplices and/or conspirators to Marzeno in the commission of the murders. The State contended that the victims were robbed of cocaine and then murdered to prevent Columbian drug lords from seeking revenge.
At the conclusion of an 18 day trial which ended on November 18, 1988, the jury found each defendant guilty under Counts One, Two, Five and Seven. The jury found Marzeno guilty as the principal and Kamienski and Alongi as accomplices of Marzeno under the two counts charging knowing or purposeful murders and the felony murders count. Under Count Six, the jury also found each defendant guilty of conspiracy to possess cocaine with intent to distribute, but not guilty of conspiracy to murder and to rob.
Prior to sentencing, the trial judge heard a motion for a new trial or in the alternative for the entry of j.n.o.v. The trial judge entered j.n.o.v. in favor of Kamienski and Alongi for the two murders and the felony murders under Counts One, Two and Five. Kamienski was then sentenced on Count Six to a custodial term of 12 years with four years of parole ineligibility. On Count Seven, he was sentenced to a consecutive custodial term of 12 years with six years of parole ineligibility. A total fine of $50,000 was imposed. His aggregate sentence is 24 years with 10 years of parole ineligibility. Kamienski filed his notice of appeal on December 30, 1988 under A-2350-88T5.
Alongi was sentenced on Counts Six and Seven to consecutive custodial terms of 12 years with six years of parole ineligibility on each count and a total fine of $50,000 was imposed. His aggregate sentence is 24 years with 12 years of parole ineligibility. Alongi filed his notice of appeal on January 26, 1989, *82 under A-3611-88T5. The State filed its appeal from the j.n.o.v. on April 3, 1989, under A-3689-88T5.
Marzeno was sentenced on Counts One and Two to consecutive life terms with 30 years of parole ineligibility on each count. The felony murders under Count Five were merged with Counts One and Two. He was sentenced on Counts Six and Seven to consecutive 12 year custodial terms with six years of parole ineligibility on each count. His aggregate sentence was double life plus 24 years with 72 years of parole ineligibility. Marzeno filed a notice of appeal on February 1, 1989, under A-3946-88T5.
While the four appeals were pending, defendants filed a second motion for a new trial based on their assertion that subsequent to the sentencing, it came to their attention that one of the trial jurors, Angela Metta Krebs, failed to disclose a social relationship with one of the State's key witnesses, Jean Calabro Yurcisin. We remanded the matter temporarily for a judge to conduct an in camera interview with the juror. An interview was conducted by a judge who did not preside over the trial. He denied the motion on December 22, 1989, because he found the two women were not acquainted.
Marzeno's appeal was dismissed by consent on February 5, 1991, because of his death. We entered an order on February 28, 1991, permitting Kamienski and Alongi to adopt Points II through VIII raised in Marzeno's brief.
In its appeal, the State raises the following contentions:
I THERE WAS NO INCONSISTENCY IN THE VERDICTS RETURNED BY THE JURY; ALTERNATIVELY INCONSISTENT VERDICTS DO NOT VITIATE AN OTHERWISE REASONABLE VERDICT, THEREFORE THE TRIAL JUDGE'S FINDING THAT FACTS EXISTED CONSISTENT WITH CRIMINAL LIABILITY SHOULD BE UPHELD.
II THERE EXISTS EVIDENCE BEYOND A SCINTILLA AND VIEWED FAVORABLY TO THE STATE, THAT DEFENDANTS ALONGI AND KAMIENSKI WERE PROPERLY FOUND GUILTY BY THE JURY AS ACCOMPLICES TO MURDER.

*83 III DEFENDANTS WERE PROPERLY FOUND GUILTY BY THE JURY ON FELONY MURDER AS ACCOMPLICES TO A ROBBERY AND THE JUDGMENT OF ACQUITTAL SHOULD BE REVERSED.
Kamienski raises the following issues in his appeal:
I DEFENDANT KAMIENSKI'S FEDERALLY AND STATE GUARANTEED RIGHTS TO A FAIR TRIAL BY AN IMPARTIAL JURY WERE VIOLATED BY THE JURY SELECTION PROCESS.
II THE COURT ERRONEOUSLY DENIED DEFENDANT KAMIENSKI'S SEVERAL APPLICATIONS TO SEVER HIS TRIAL FROM HIS CO-DEFENDANTS' TRIAL.
III DEFENDANT KAMIENSKI'S FEDERALLY AND STATE GUARANTEED RIGHTS TO A FAIR TRIAL WERE VIOLATED BY THE ERRONEOUS ADMISSION OF INFLAMMATORY EVIDENCE, UNDUE RESTRICTIONS PLACED ON THE CROSS-EXAMINATION OF A STATE'S WITNESS, THE OUTBURST OF ANOTHER STATE'S WITNESS DURING HER CROSS-EXAMINATION, AND THE ERRONEOUS ADMISSION OF CO-DEFENDANT MARZENO'S STATEMENT.
IV DEFENDANT KAMIENSKI'S FUNDAMENTAL RIGHTS TO A FAIR TRIAL WERE VIOLATED BY SEVERAL REMARKS MADE BY THE PROSECUTOR DURING HIS SUMMATION. (SOME ISSUES RAISED WERE NOT RAISED BELOW).
V THE COURT ERRONEOUSLY DENIED DEFENDANT KAMIENSKI'S SEVERAL APPLICATIONS TO MERGE COUNTS SIX AND SEVEN OF THE INDICTMENT BOTH OF WHICH CHARGED CONSPIRACY TO POSSESS COCAINE WITH INTENT TO DISTRIBUTE.
VI DEFENDANT KAMIENSKI'S APPLICATION, ON REMAND, FOR A NEW TRIAL SHOULD BE REMANDED AGAIN FOR FURTHER PROCEEDINGS.
VII DEFENDANT KAMIENSKI JOINS AND ADOPTS CO-DEFENDANTS ARGUMENTS.
VIII DEFENDANT KAMIENSKI'S TWO CONSECUTIVE TWELVE YEAR TERMS OF IMPRISONMENT, WITH PERIODS OF PAROLE INELIGIBILITY OF SIX YEARS AND FOUR YEARS, WERE EXCESSIVE AND SHOULD BE REDUCED.
In his pro se brief, Alongi raises the following contentions:
I INEFFECTIVE ASSISTANCE OF COUNSEL THROUGH GOVERNMENT INTERFERENCE.
II DUPLICITY OF THE CONSPIRACIES CAUSE OF DOUBLE JEOPARDY AND DOUBLE COUNTING, TO: VACATE JUDGMENT OF CONVICTION AND OR TO MERGE INTO A SINGLE CONSPIRACY.
III GRAND JURY TAINTED THROUGH GOVERNMENT INTERFERENCE.

*84 IV SUPPLEMENT AND AMENDMENT TO: LIMITED REMAND OF PETIT JUROR ANGELA (METTA) KREBS, AND IMPROPER PETIT JUROR SELECTION.
In a brief filed on behalf of Marzeno, the following issues were raised and have been adopted by Kamienski and Alongi:
II THE JURY SELECTION PROCESS VIOLATED DEFENDANT'S RIGHT OF DUE PROCESS.
III THE DEFENDANT'S MOTION FOR A NEW TRIAL SHOULD HAVE BEEN GRANTED; THE TRIAL COURT ERRED IN ITS INSTRUCTION ON PRINCIPAL-ACCOMPLICE LIABILITY.
IV THE DEFENDANT WAS UNDULY RESTRICTED IN EXERCISING HIS RIGHT OF CROSS-EXAMINATION.
V THE TRIAL COURT IMPROPERLY INVOKED A PRIVILEGE ON BEHALF OF A STATE'S WITNESS.
VI THE TRIAL COURT IMPROPERLY ADMITTED UNDULY PREJUDICIAL PHOTOGRAPHS OF THE HOMICIDE VICTIMS.
VII THE PROSECUTOR EXCEEDED THE BOUNDS OF FAIR PLAY. (PARTIALLY RAISED BELOW).
VIII DEFENDANT MARZENO'S APPLICATION, ON REMAND, FOR A NEW TRIAL SHOULD BE REMANDED AGAIN FOR FURTHER PROCEEDINGS.

II. GENERAL FACTS
On September 24, 1983, the body of Henry DeTournay, 33, was recovered from Barnegat Bay in Toms River, New Jersey. The following day the body of his wife, Barbara DeTournay, 39, also was recovered from Barnegat Bay, approximately one mile east from where her husband's body was found. Henry's body was wrapped in a blue sleeping bag, a rust colored blanket and a rose pattern towel. Barbara's body was wrapped in a rust colored blanket. Both bodies were weighted down with 16-inch cement blocks and the same type rope was used to secure both bodies.
Autopsies performed on September 26, 1983, revealed that Henry was shot three times, had a postmortem fracture of the skull and marks on his neck indicating attempted manual strangulation. Barbara was shot seven times. The victims were killed with a 9mm automatic weapon. Investigators discovered the telephone numbers of defendants Kamienski and Alongi *85 inside Henry's wallet which was found with his body. Also found inside the wallet were directions to Alongi's house, located in Toms River. Although the DeTournays lived in Miami, Florida, they were on a long term visit to New Jersey in September 1983. After an extended investigation, an indictment was filed against the defendants on October 4, 1987.
In September 1983, Marzeno lived in Island Heights, New Jersey. From September 1983 until February 1984, Jean Calabro Yurcisin was his friend and companion. During the summer of 1983, Yurcisin worked as a waitress at the Top O' The Mast restaurant in South Seaside Park, New Jersey. Marzeno, Alongi, Alongi's girlfriend-wife, Kamienski and Kamienski's girlfriend dined at the Top O' The Mast restaurant on several occasions during the summer and fall of 1983.
Alongi, age 61, was a Toms River real estate businessman. He lived on Baron Street which bordered on a lagoon that enters Barnegat Bay. Alongi had extensive use of a boat which he docked in a marina behind his house. He married his girlfriend, the former Jackie Sullivan, shortly before the trial in this matter. During the trial, some witnesses described Alongi as a distinguished looking man who did not use cocaine, but was involved in its distribution for profit. Alongi met Kamienski in the spring of 1983 when he showed him condominiums which were for sale in the Toms River area.
Kamienski, age 43, was president of his family's business, Kamienski's Funeral Home. From 1981 until 1987, Kamienski lived in an apartment above the family's Garfield, New Jersey funeral home with his girlfriend, Donna Duckworth, age 28. From time to time they also lived on Kamienski's boat, the Foreplay III, docked at Ocean Beach Marina in Lavallette, New Jersey, and in Stuart, Florida, where Kamienski owned a car dealership. According to Duckworth, the couple spent about "24 hours a day" together, and they "partied almost every night" by using cocaine and speed. Kamienski supplied the drugs he and Duckworth consumed. Duckworth first met *86 Alongi and Marzeno on Kamienski's boat during the summer of 1983. Kamienski bought cocaine from Alongi and Marzeno and they socialized with them nearly every day after the first meeting. During the summer of 1982, Kamienski and Duckworth met Barbara and Henry DeTournay at Ocean Beach Marina when their boats were docked in adjoining slips. The couples socialized and used cocaine together.
It was the State's contention during the trial and on appeal that the events which led to the murders began during the Labor Day weekend (September 3-5) of 1983 when Barbara and Henry DeTournay spent the weekend in Newark with Barbara's parents, Barbara's sister, Christine Longo, and her husband Leonard. The DeTournays left Newark to spend time on Kamienski's boat and to negotiate a drug deal. On September 11, the DeTournays arranged to have their drug courier bring three kilos of cocaine to them in Toms River.
Christine Longo testified that when the DeTournays returned to Newark, Barbara told her that they had slept on Kamienski's boat down the shore after a party. Christine said Barbara was happy because the drug deal they were in the process of negotiating would make them "set for life." On September 17, Henry received a telephone call at the home of his in-laws. Henry then left the house and used a public telephone located just outside his in-laws' home. Telephone records show that a phone call was made from that public telephone on September 17, 1983 to Alongi at 2:40 p.m. When Henry returned to the house, he told Barbara to pack their belongings as they had to go to the Jersey Shore. Henry said they were leaving because "I got something big. I got something real big going." The DeTournays left Newark on September 17 shortly after receiving another phone call that evening. Telephone records indicate a second phone call was made from the public phone in Newark to Alongi at 8:01 p.m. When they left Newark, Henry said, "Come on Barb, this is it." That was the last time the family saw the DeTournays alive.
*87 During the days following September 17, Christine received several telephone calls from Sidney Jeffrey, II, looking for the DeTournays. He was the drug courier for the DeTournays and he feared they had ripped him off. Jeffrey testified for the State, and in exchange for his testimony, the State agreed not to charge or prosecute him for his involvement.
Jeffrey testified that before the 1983 Labor Day weekend, he brought 12 ounces of cocaine from Florida to the DeTournays in Toms River, New Jersey. He was the courier because Henry looked like a hippie and would attract too much attention. On September 11, 1983, the DeTournays arranged for Jeffrey to bring three kilos of cocaine to Toms River. On September 17, Jeffrey called Henry in Newark and informed him that he had arrived in Toms River with the cocaine and that he was staying at the Holiday Inn. Henry arranged to meet Jeffrey at the Holiday Inn on September 18. This was to be the first delivery of a plan to deliver three kilos of cocaine per month to Toms River. The arrangement was for the DeTournays to pay him $50,000 per kilo and he would deduct $5,000 per kilo for himself and deliver the balance to his Columbian drug lords.
Late in the day on September 18, Henry informed Jeffrey that the deal could not be finalized that day because the buyers were having trouble getting the money together. The transfer was postponed until 6:00 p.m. on September 19 at which time Henry was to drop Barbara off at the Holiday Inn and return for her after the buyers produced the money.
When Barbara arrived at the Holiday Inn, she told Jeffrey there had been another change in plans. The change was that Henry would not return for her because he would be counting the money. Instead, a "very distinguished looking man," fitting Alongi's description, would be picking her up. Barbara left the hotel at 5:00 p.m. with the three kilos of cocaine after she recognized the expected car pull into the parking lot. Jeffrey's description of the car fits the description of a car owned by Alongi. He saw Barbara enter the car and he *88 watched it head east (in the direction of Alongi's house). That was the last he ever saw either the DeTournays or the cocaine.
The State relied heavily upon testimony presented by Kamienski's girlfriend, Donna Sue Duckworth; the girlfriend of Marzeno, Jean Calabro Yurcisin; George Hunt, Alongi's neighbor; Arthur Lehman, a drug user; and several other witnesses to establish the drug conspiracies and to establish how, when and where the victims were killed as well as to establish the participation of the defendants. The details of some of that testimony will be discussed later. Based on the total evidence, the State argued to the jury that the killings occurred at Alongi's house when Marzeno shot the victims and that all three defendants participated in one way or another as accomplices and/or as conspirators in the commission of the robbery, the murders and in disposing of the bodies.

III. STATE'S APPEAL
First we will consider the State's appeal from the j.n.o.v. Defendants Alongi and Kamienski filed their first motion for a new trial under R. 3:20-1, or in the alternative for the entry of a judgment of acquittal pursuant to R. 3:18-2. Defense counsel argued that the verdicts were inconsistent and that the evidence was insufficient to support a conviction. The judge based his decision on his recollection of part of his instruction to the jury which he concluded was erroneous even though counsel did not urge that as a basis for relief. The judge also concluded that the verdict of the jury finding Alongi and Kamienski not guilty of conspiracy to rob or to murder the DeTournays precluded a guilty verdict based on accomplice liability. The State contended below and on this appeal that the jury was instructed properly. It is beyond dispute that correct jury charges are essential to a fair trial and that an erroneous charge on a material point is presumed to be reversible error. State v. Grunow, 102 N.J. 133, 148, 506 A.2d 708 (1986).
*89 The judge concluded that his jury instructions required a new trial on Counts One, Two and Five under R. 3:20-1. But because he found the evidence was insufficient to sustain a verdict, he granted j.n.o.v. on those counts. The decision that a new trial was required and the granting j.n.o.v. requires us to focus first on the pertinent aspects of the jury charge to see if there was error. This task is complicated by the fact that neither the trial judge nor the briefs submitted in these appeals have identified where in the record the alleged error in the charge occurred. See R. 2:6-4(a).
We begin with the general instruction to the jury that it could consider the conduct of each defendant which occurred before the crimes, during the commission of the crimes and after the commission of the crimes when determining whether Alongi and Kamienski were guilty as conspirators and/or as accomplices. Maybe this general instruction led the judge to conclude, based on his faulty recollection, that he erroneously instructed the jury "that the act of disposing of the bodies could be considered by them as an act with purpose to promote or facilitate the commission of the crimes of murder." It was the judge's faulty recollection that he instructed the jury "in effect that if they believed defendants [Alongi and Kamienski] participated in the disposition of the bodies, they could be charged with the murders and felony murders as accomplices." Believing that he had improperly instructed the jury, the judge found that his charge:
[P]ermitted the jury to consider the actions of defendants Alongi and Kamienski in disposing of the bodies as a basis for accomplice status in and of themselves, rather than as merely evidence from which inferences could be drawn as to the purpose of the conduct by the two of them before or during the robbery and murders.
The record does not support the judge's perception that there was error in the charge.
Notwithstanding the fact that the judge found that his error required a new trial, he declined to grant a new trial because he concluded that even if there was no error in the charge, the *90 State's evidence was insufficient to support a conviction under Counts One, Two and Five as to Alongi and Kamienski. Thus a j.n.o.v. was entered pursuant to R. 3:18-2 rather than granting a new trial.

A. Jury Instruction
The jury was instructed that, under the indictment and the evidence, the State contended that Marzeno was the triggerman who killed the DeTournays and that Alongi and Kamienski acted as accomplices and/or as conspirators. The jury was instructed further that for either one to be an accomplice, he must act with the purpose of promoting or facilitating the substantive crime of robbery, murder or felony murder regardless of whether the conduct under scrutiny occurred before, during or after the crime. The jury was instructed that the mere presence of Alongi and Kamienski at the scene of the robbery and killings was not sufficient to convict, but such circumstances could be considered in conjunction with all the other evidence.
In fact, the judge followed the model jury charge and instructed the jury that:
I've mentioned already that the action that an accomplice takes has to be with a purpose of promoting or facilitating the crime in question. I've already explained to you what purpose means, conscious object. That is someone who is said to be an accomplice is said to have, must be shown to further the crime of murder. Again, whether before or during or after the actual killing. Mere presence at or near the scene of a crime does not make one a participant in the crime as an accomplice or otherwise. Nor does the failure of a spectator to interfere make a person a participant. It is, however, a circumstance that may be considered together with the other evidence in determining whether the person was present as an accomplice, but presence is not, in itself, conclusive evidence of that fact. Whether presence has any probative value, whether it's important, depends upon the total circumstances. To constitute guilt as an accomplice there must exist a community of purpose and actual participation in the crime.
Community of purpose and actual participation. What that means is that they must have been acting together with the same purpose to commit or to further the commission of the crime of murder. While mere presence at the scene of the perpetration of a crime does not render, by itself, does not render a person a participant in the crime, prove that somebody is present at the scene of *91 the commission of a crime without disapproving or opposing it is evidence from which, in connection with all other circumstances, it is possible for a jury to infer that the person assented or agreed to the crime, lent to it his countenance and approval, and was thereby aiding or abetting the crime. It depends upon the totality of the circumstances as those circumstances appear from all of the evidence. However, one cannot be held to be an accomplice unless you find as a fact that at the time he was an accomplice he possessed the same criminal state of mind, that is, the purpose to commit or facilitate the crime of murder that is required to be proved against the person who actually committed the crime itself.
The jury was instructed that the State could prove the elements of accomplice liability through direct and circumstantial evidence. The court defined circumstantial evidence by stating:
[C]ircumstantial evidence is evidence that allows you, if you choose to, to draw a conclusion from this fact that another fact exists. The law does not require that anything that has to be proved in a case be proved by direct evidence or by circumstantial evidence, it can be proved by either or both in combination.
In an effort to explain to the jury how one could become criminally responsible as an accomplice or as a coconspirator in a felony murder where robbery is the felony, the judge used three hypothetical examples. The second example given involved a bank robber who stopped an unsuspecting motorist for a ride to an airport. The hypothetical motorist had no knowledge of the robbery until he was flagged down. The robber entered the car and told the motorist "I just robbed that bank, I got to get away, take me to the airport will you?" The motorist rushed the robber to the airport. Under that hypothetical scenario, the judge told the jury that the driver was chargeable as "being an accomplice and probably, also, a conspirator because even though there was no specific agreement other than what he does, what he did was he acted in a way that enabled me to complete the crime."
To make certain the instructions were complete and accurate and that the jury did not misunderstand or make an improper use of that hypothetical example, the judge informed the jury that:
[T]he State would have to show that Alongi and Kamienski had the purpose of furthering or promoting the crime of robbery so that they would have to be *92 aware of the fact of the crime of robbery and their conduct before or during the fact would have to be undertaken by them with the purpose of promoting the crime of robbery. Keep in mind the example of the guy driving away. If he drives away knowing that he's helping the bank robber get away, and having that as his purpose, he's guilty as an accomplice or as a conspirator. If, on the other hand, he acts in the same fashion but doesn't know, and doesn't intend that his conduct or his agreement to act are designed to help somebody commit the robbery, then he's not guilty as an accomplice or as a conspirator.
Additionally, the jury was instructed that knowledge, purpose and intent refer to a person's mental state which:
may be inferred from what someone does or says or the specific circumstances in which they act. So that's the kind of evidence that you will need to use with respect to the deciding what someone's purpose was or someone's knowledge was at a specific point of time. You have to look at what they do and what they say and the circumstances in which they do it, and from that you would draw conclusions about what they knew or what they intend at any given time.
* * * * * * * *
It is within the power of the jury to find that proof of purpose or proof of knowledge has been furnished beyond a reasonable doubt by inferences which may arise from the nature of the acts and circumstances surrounding the acts under investigation. Such things as the place where the act occurred, ..., all that was done or said by the defendant preceding, connected with, immediately succeeding or following the events leading to the death of the victims are among the circumstances to be considered.
We are persuaded that the judge erred in granting the j.n.o.v. First, the charge did not contain an error. Second, even the perceived portion "of a [jury] charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973). See also State v. Marshall, 123 N.J. 1, 135, 586 A.2d 85 (1991); State v. Ramseur, 106 N.J. 123, 280, 524 A.2d 188 (1987). This is so because it is not possible for the judge to state all the law in one simple concise sentence. State v. Hipplewith, 33 N.J. 300, 317, 164 A.2d 481 (1960). Considering the jury instructions in their entirety, we conclude that the jury was not informed that it could convict Alongi or Kamienski of murder based solely on helping to dispose of the bodies. Indeed, the charge always clearly informed the jury it was obligated to consider all the evidence and the surrounding circumstances in deciding *93 whether Alongi and Kamienski aided or assisted Marzeno in robbing and killing the DeTournays and whether they acted with the same purpose as did Marzeno. Consequently, we reverse the finding that a new trial was warranted under R. 3:20-1.

B. No Inconsistent Verdicts
We are also persuaded that a verdict of not guilty of a conspiracy to rob or to murder is not inconsistent with a verdict of guilty of felony murder based on a killing during the course of a robbery and murder as accomplices. The conspiracy statute under which defendants were found not guilty of conspiring to rob or to murder, is N.J.S.A. 2C:5-2. It provides in pertinent part:
a. Definition of conspiracy. A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:
(1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
(2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime. [N.J.S.A. 2C:5-2].
In general, the aim in criminalizing conspiracies is to prosecute the agreement itself, thus punishing jointly planned criminal activity quite apart from any underlying offense involved in the conspiracy. State v. Hardison, 99 N.J. 379, 383, 492 A.2d 1009 (1985); see State v. Stefanelli, 78 N.J. 418, 428-429, 396 A.2d 1105 (1979). The gist of a conspiracy is the "actual agreement for the commission of the substantive crime... [and] one may be liable as [an accomplice] even though no conspiracy existed between him and the immediate perpetrator of the substantive crime." State v. Madden, 61 N.J. 377, 394, 294 A.2d 609 (1972); see State v. La Fera, 35 N.J. 75, 86, 171 A.2d 311 (1961). "The agreement is an advancement of the intention which each has conceived in his mind; the mind proceeds from a secret intention to the overt act of mutual *94 consultation and agreement." State v. Carbone, 10 N.J. 329, 337, 91 A.2d 571 (1952). To establish an agreement, the State was obliged to prove there was a meeting of the minds of the parties "in an understanding way with the single design to accomplish a common purpose...." Martin v. United States, 100 F.2d 490, 495 (10th Cir.1938), cert. denied, 306 U.S. 649, 59 S.Ct. 590, 83 L.Ed. 1047 (1939).
To be sure, the agreement need not be formal or express. United States v. Zang, 703 F.2d 1186, 1191 (10th Cir.1982), cert. denied, 464 U.S. 828, 104 S.Ct. 103, 78 L.Ed.2d 107 (1983). An implicit or tacit agreement may be inferred from the facts and circumstances. State v. Dennis, 43 N.J. 418, 423, 204 A.2d 868 (1964); State v. Yormark, 117 N.J. Super. 315, 330, 284 A.2d 549 (App.Div. 1971), certif. denied, 60 N.J. 138, 286 A.2d 511 (1972); see also State v. Carbone, supra, 10 N.J. at 341-342, 91 A.2d 571; State v. Goodman, 9 N.J. 569, 581, 89 A.2d 243 (1952).
Frequently, it is the most difficult task for a jury to determine whether an illicit agreement has been made and whether one acted in furtherance of the conspiracy. This is so, primarily, because "silence, furtiveness and secrecy shroud the conduct and speech of coconspirators." State v. Phelps, 96 N.J. 500, 509, 476 A.2d 1199 (1984) (quoting Note, "The Coconspirator's Expectation to the Hearsay Rule: Bootstrapping in the New Procedure from the First Circuit," 50 U.Colo.L.Rev. 93, 103-104 (1978)).
Therefore, the jury verdict that there was no conspiracy to rob or to murder quite conceivably resulted from a belief that the State failed to establish an illicit agreement. See State v. Hardison, supra, 99 N.J. at 383, 492 A.2d 1009. Beyond that, it is fundamental under our system of jurisprudence that a jury is free to reject one theory of liability under the evidence and accept another. See State v. Ragland, 105 N.J. 189, 204-213, 519 A.2d 1361 (1986); State v. Ingenito, 87 N.J. 204, 211-212, *95 432 A.2d 912 (1981); State v. Cooper, 10 N.J. 532, 569, 92 A.2d 786 (1952).
A finding of no conspiracy to rob or to murder does not legally preclude a guilty verdict on the murders and felony murders as accomplices of Marzeno under N.J.S.A. 2C:2-6. The subsections of this statute provide that a person is guilty of an offense if the offense is committed by his or her own conduct or by the conduct of another person when he or she is an accomplice of such other person in the commission of that offense. N.J.S.A. 2C:2-6a and 6b(3). An accomplice of another, as is pertinent to this case, is defined to be a person, who with "the purpose of promoting or facilitating the commission of the offense, ... [s]olicits such other person to commit it; [a]ids or agrees or attempts to aid such other person in planning or committing it." N.J.S.A. 2C:2-6c(1)(a) and (b); State v. Weeks, 107 N.J. 396, 401-402, 526 A.2d 1077 (1987); State v. White, 98 N.J. 122, 128-129, 484 A.2d 691 (1984); see State v. Bass, 221 N.J. Super. 466, 486-487, 535 A.2d 1 (App.Div. 1987), certif. denied, 110 N.J. 186, 540 A.2d 182 (1988); State v. Gelb, 212 N.J. Super. 582, 591, 515 A.2d 1246 (App.Div. 1986), certif. denied, 107 N.J. 633, 527 A.2d 456 (1987).
Our accomplice liability statute delineates four ways one can become an accomplice, becoming part of a conspiracy is only one of the four. In view of the clear statutory language, the finding by the jury that Alongi and Kamienski acted as accomplices of Marzeno could be made independent of whether there was an illicit agreement. State v. Madden, supra. Because an illicit agreement was not required to establish accomplice liability under N.J.S.A. 2C:2-6a, 6b(3) and 6c(1)(a) and (b), and such an agreement was not an element of the substantive offenses of murder and felony murder, even inconsistent verdicts are permitted, so long as the evidence was sufficient to establish guilt on the substantive offenses beyond a reasonable doubt. State v. Mangrella, 214 N.J. Super. 437, 441-442, 519 A.2d 926 (App.Div. 1986), certif. denied, 107 N.J. 127, 526 A.2d 194 (1987); State v. Peterson, 181 N.J. Super. 261, 266-267, 437 A.2d 327 *96 (App.Div. 1981), certif. denied, 89 N.J. 413, 446 A.2d 144 (1982); State v. Hawkins, 178 N.J. Super. 321, 322-323, 428 A.2d 1322 (App.Div.), certif. denied, 87 N.J. 382, 434 A.2d 1066 (1981); State v. Newell, 152 N.J. Super. 460, 466, 378 A.2d 47 (App.Div. 1977).
We are further persuaded that even though the jury found that the State failed to prove a conspiracy to rob or to murder, much of the evidence presented to establish such a conspiracy was also relevant to establish Alongi's and Kamienski's guilt as accomplices to Marzeno in the commission of the substantive offenses of murders and felony murders. See State v. Phelps, supra, 96 N.J. at 516, 476 A.2d 1199; State v. Louf, 64 N.J. 172, 176, 313 A.2d 793 (1973); State v. Farinella, 150 N.J. Super. 61, 68-69, 374 A.2d 1229 (App.Div.), certif denied, 75 N.J. 17, 379 A.2d 248 (1977); see also State v. Clausell, 121 N.J. 298, 336-337, 580 A.2d 221 (1990). As accomplices, that evidence was limited to their individual conduct described in N.J.S.A. 2C:2-6c(1)(a) and (b) and the jury was told as much.
While mere presence at the scene of a murder does not make one a participant, State v. Loray, 41 N.J. 131, 139, 195 A.2d 289 (1963); State v. Fox, 70 N.J.L. 353, 355, 57 A. 270 (Sup.Ct. 1904), unless there is a duty to act such as that discussed in N.J.S.A. 2C:2-1b(2) and N.J.S.A. 2C:2-6c(1)(c), direct or indirect participation in the commission of the criminal act where there is the shared purpose to achieve the criminal objective renders one guilty of the criminal act. State v. Fair, 45 N.J. 77, 95, 211 A.2d 359 (1965); State v. Riley, 28 N.J. 188, 196-197, 145 A.2d 601 (1958), app. dismissed and cert. denied, 359 U.S. 313, 79 S.Ct. 891, 3 L.Ed.2d 832 (1959); State v. Wooters, 228 N.J. Super. 171, 175-178, 549 A.2d 441 (App.Div. 1988); State v. Boyer, 221 N.J. Super. 387, 402-403, 534 A.2d 744 (App.Div. 1987), certif. denied, 110 N.J. 299, 540 A.2d 1280 (1988); State v. Bass, supra, 221 N.J. Super. at 486-487, 535 A.2d 1; State v. Gelb, supra, 212 N.J. Super. at 591, 515 A.2d *97 1246. An earlier observation by us is applicable to the present case:
Although mere presence at or near the scene of the crime, or the failure to intervene, does not make one a participant in the crime, presence at the commission of a crime without disapproving or opposing it is evidence which, in connection with other circumstances, permits the inference that he asserted [sic] thereto, lent to it his countenance and approval, and was thereby aiding and abetting the same. State v. Newell, supra, 152 N.J. Super. at 469 [378 A.2d 47] (Emphasis supplied) (citing State v. Smith, 32 N.J. 501, 521 [161 A.2d 520] (1960), cert. den., 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367 (1961)). [State v. Gelb, supra, 212 N.J. Super. at 591, 515 A.2d 1246.]

C. Sufficiency of the Evidence
The State further argues that the evidence was sufficient to sustain the verdicts against Alongi and Kamienski. You will recall that the judge decided that even if the jury was instructed properly, the evidence was insufficient to sustain the verdicts and entered a j.n.o.v. as to Counts One, Two and Five pursuant to R. 3:18-2. In reaching that conclusion, the judge stated:
The verdict acquitting defendants Alongi and Kamienski of the conspiracy to rob or to murder would preclude a retrial on the theory that they were chargable as principals for the murders or felony murders by reason of their conspiracy status. This would leave for retrial only the charge that these defendants were guilty of the murders and felony murders as accomplices. There is not sufficient evidence to support such a verdict. While it can be argued that all of the conduct of defendants Alongi and Kamienski before the afternoon of the 19th is consistent with accomplice liability and the requisite purpose to promote or facilitate the crimes of robbery and murder, the verdict acquitting them of conspiracy to rob or to murder renders this theory untenable. If defendants Alongi and Kamienski did not conspire to commit these crimes, they could be charged therewith in a new trial only as accomplices and only on the basis of their actions during the commission of the crimes. There was no evidence of their conduct during the commission of the crimes except, inferentially, their presence at the scene, which would not by itself suffice to sustain a verdict. The State relies upon this inference to sustain the further inference that defendants Alongi and Kamienski assented to the robbery and murders, lent to the crimes their countenance and approval, and thereby are chargable therewith as accomplices. This latter inference, however, rests not upon any evidence of their presence at the scene of the crimes but upon the inference of their presence. Thus there does not appear to be sufficient evidence to establish the requisite purpose to promote or facilitate the crimes of robbery or murder, as opposed to the crime of possession of *98 controlled dangerous substance with intent to distribute, in the conduct of defendants Alongi and Kamienski prior to or during the meeting on the afternoon of the 19th. [Emphasis supplied].
The judge's reasoning contains several legal flaws. The first is that because the jury acquitted defendants Alongi and Kamienski of conspiracy to rob and to murder, that decision by the jury precluded a verdict based on accomplice liability. The second flaw is that only action taken by Alongi and Kamienski during the actual commission of the murders and felony murders was relevant to a determination of their guilt as accomplices. You will recall that we have previously explained the shortcomings related to these legal conclusions.
We reiterate that the jury was properly instructed that Alongi and Kamienski could be found guilty under the murder and felony murder counts as a conspirator and/or an accomplice of Marzeno based upon all the evidence presented. The jury was told it could base its verdict on either one but not necessarily on both. The jury was further instructed that the essential difference between the two is that a conspiracy involves an agreement between two or more people "to help or the agreement to assist or facilitate or to make it possible for ... the planning or the commission of the crime."
In addition, the jury was further informed that "anybody who is a conspirator is always an accomplice. However, there are certain circumstances in which somebody could be an accomplice without necessarily being a conspirator." It must be presumed that the jury followed the court's instructions. State v. Perry, 124 N.J. 128, 166, 590 A.2d 624 (1991). Under these proper instructions from the court, there was no valid reason why the jury was not permitted to consider all of the evidence presented, as to what transpired before, during and after the afternoon of the 19th in deciding whether Alongi and Kamienski were accomplices to Marzeno and whether they acted with the purpose to render assistance in furtherance of the robbery and the murders.
*99 Considered in that context, we disagree with the judge's determination that the evidence was insufficient to establish Alongi's and Kamienski's guilt as accomplices to Marzeno beyond a reasonable doubt. Our role in evaluating the evidence is the same as the trial court's. The standard for determining the sufficiency of the evidence requires us to view all of the evidence, both direct and circumstantial, in a light most favorable to the State and to consider all reasonable inferences which reasonably could be drawn from that evidence. State v. Brown, 80 N.J. 587, 591-592, 404 A.2d 1111 (1979); State v. Reyes, 50 N.J. 454, 458-459, 236 A.2d 385 (1967). "[T]he veracity of each inference need not be established beyond a reasonable doubt in order for the jury to draw the inference." State v. Brown, supra, 80 N.J. at 592, 404 A.2d 1111; State v. DiRienzo, 53 N.J. 360, 376, 251 A.2d 99 (1969). The sufficiency standard has been satisfied if we are able to conclude that any "rational trier of fact could have found the essential elements of the crimes" of murder and felony murder beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573, reh'g denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State v. Marshall, supra, 123 N.J. at 136, 586 A.2d 85; State v. Martin, 119 N.J. 2, 8, 573 A.2d 1359 (1990); State v. Brown, supra, 80 N.J. at 592, 404 A.2d 1111.
Our careful study of the record, in light of the appropriate standard, satisfies us that there is no basis to conclude that the jury verdict on the murders and felony murders constituted a "manifest denial of justice." R. 3:20-1; see State v. Martinez, 97 N.J. 567, 571-572, 483 A.2d 117 (1984). "Concerted action [as an accomplice] need not be proved by direct evidence of a formal plan to commit a crime, which was verbally agreed to by all who were charged. Rather, the proof may be circumstantial and participation and acquiescence may be inferred from conduct, as well as spoken words." State v. Gelb, supra, 212 N.J. Super. at 591-592, 515 A.2d 1246 (citing State v. Smith, 32 *100 N.J. 501, 522, 161 A.2d 520 (1960), cert. denied, 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367 (1961)).

KAMIENSKI'S INVOLVEMENT
The DeTournays knew Kamienski the longest. They met in the summer of 1982 when their boats were docked side-by-side in the Ocean Beach Marina. Kamienski's telephone and beeper numbers were found on the body of Henry DeTournay.
Kamienski was described as being a drug user who socialized with Alongi, Marzeno and their female companions. Kamienski supplied the cocaine he and his girlfriend Donna Sue Duckworth used.
Duckworth testified that Henry DeTournay visited Kamienski on Kamienski's boat on September 3, 1983, and asked if Kamienski knew anyone who wished to purchase a large quantity of cocaine. Kamienski bought some cocaine from Henry and indicated that he had friends who might be interested in such a deal. Later that night, after Henry left, Alongi and his then girlfriend, Jackie Sullivan, arrived at the boat.
Duckworth testified that on September 5, 1983, she, Kamienski and the DeTournays travelled in Kamienski's boat to a party at Alongi's house. Kamienski introduced Alongi to the DeTournays. Kamienski complied with Henry's request that he "vouch" for Alongi, and he also vouched for the DeTournays, at Alongi's request. Duckworth testified that as they pulled away in Kamienski's boat, she saw Marzeno arrive at Alongi's home. There is an inference that Kamienski became the broker who arranged with Alongi and Marzeno as persons who would purchase large amounts of cocaine from Henry.
Duckworth testified that while she and Kamienski were at Kamienski's Garfield apartment on September 9, 1983, Henry called. In response to phone conversations, Kamienski told Henry that he did not have a scale and "to get off the boat." Duckworth said she and Kamienski returned to the Ocean Beach Marina later that day. Telephone records permit an *101 inference that Kamienski called Henry at the home of Barbara's parents on September 9, 1983 at 10:38 p.m. On September 23, 1983, one day before the bodies were found, Kamienski called Alongi four times between 2:17 a.m. and 11:17 p.m.
When Barbara DeTournay and her husband Henry left her mother's home in Newark at the end of the 1983 Labor Day weekend, Barbara told her sister Christine that they were going to the Jersey Shore to spend time on Kamienski's boat. Dr. Fred Adams testified that he saw the DeTournays just before they went to Toms River to have a business meeting. The DeTournays told him they were broke and needed to sell some cocaine. When he saw them a few days later, they said their financial problems had been solved because they had met with a group of men, headed by a distinguished looking non-user of cocaine (fitting Alongi's description), who wanted to purchase a large amount of cocaine on a regular basis. After seeing Dr. Adams, Barbara and Henry DeTournay went back to Barbara's parent's home and told her sister Christine that they had slept on Kamienski's boat after a party at the Jersey shore. The DeTournays left Newark again on September 17 when Jeffrey, the drug courier or the "mule," called and told them he was at the Holiday Inn in Toms River with the three kilos of cocaine ordered by the DeTournays.
Kamienski and Duckworth attended a party on September 17, 1983 at Alongi's home at the shore. There was talk at the party that good quality cocaine would be coming into town soon through friends of Kamienski and Alongi. Marzeno and Alongi indicated at the party that the cocaine would be available on September 18 and promised Arthur Lehman he could get some of the kilo quality cocaine on the 18th.
Henry arranged to meet with Jeffrey at the Holiday Inn in Toms River to pick up and deliver the cocaine to the buyers on the 18th. Jeffrey and Henry had agreed that Henry would meet with the buyers first without the cocaine. Henry met with the buyers at about 11:30 a.m. on the 18th, and he did not *102 take the cocaine. At that meeting the buyers informed Henry that they were having some difficulties getting the money together. The transfer was postponed until 3:00 p.m. on the 19th.
Kamienski was seen at the Holiday Inn on 18th at about 6:30 p.m. in the company of Marzeno and Alongi. Marzeno called Jean Yurcisin to pick him up from the Holiday Inn on the 18th. When she picked him up, he was carrying a briefcase which contained a gun but no money. Marzeno said the sellers wanted to see the money first but he had no intention of turning over any money to them and that he would kill them before they got any of his money. A reasonable inference can be drawn that Marzeno had planned to rob and maybe kill the DeTournays to obtain the cocaine on the 18th because he had only a gun in the briefcase and because he had promised to obtain the cocaine on the 18th and to sell some to Lehman on the same day. But the Holiday Inn was rather public and Henry did not bring the drugs, so a scheme was devised to get Henry and Barbara to Alongi's home which was much more isolated.
On the 19th, Henry was seen at Alongis' home between approximately 3:00 p.m. and 5:00 p.m., the time Henry said he would be counting the money before producing the drugs. While the money was supposedly being counted, Barbara was waiting in Jeffrey's Holiday Inn room to be picked up with the cocaine. At approximately 6:00 p.m. to 6:15 p.m., Barbara left the hotel parking lot in a car, fitting the description of the one belonging to Alongi, which was being driven by a male. She carried the three kilos of cocaine in a green bag.
On the 19th, Kamienski drove his car to take Duckworth from his boat in Lavallette to visit her girlfriend Janet O'Donnell, in Seaside Heights to spend the day. He dropped her off at approximately 2:30 p.m., which was only 30 minutes before the drug deal was to be finalized. Duckworth regarded this conduct by Kamienski to be unusual because she and Kamienski *103 were rarely apart and he never drove a car. His license was suspended.
Between 7:30 and 7:45 p.m. Kamienski picked up Duckworth from O'Donnell's house and drove directly to Alongi's house, a drive of about five minutes. By this time, the murders had already occurred. Upon their arrival at Alongi's house, Kamienski told Duckworth to go upstairs to the kitchen to be with Jackie Sullivan. A reasonable inference can be drawn that because Duckworth had been present when Kamienski bought drugs in the past, Kamienski did not want Duckworth present this time because he was participating in much more than a drug sale and he did not want her to be an eye witness.
But Duckworth saw something anyhow. Shortly after being in the kitchen, Sullivan received a phone call and while Sullivan was on the telephone, Duckworth went down to the dock looking for Kamienski. She saw Kamienski standing on the dock near Alongi's boat looking toward the boat where Alongi was located. The dock was wet and appeared to have been hosed down recently. She observed what appeared to be two bodies: one was wrapped in what appeared to be a brown blanket and the other was wrapped in what appeared to be a sleeping bag. Alongi lunged for her as she got closer. Kamienski assured Alongi that Duckworth would not tell what she had seen. Duckworth and Sullivan were sent to the mall to purchase liquor.
Duckworth also testified that the towel and blankets found wrapped around the bodies were similar to ones she had seen on Kamienski's boat before the murders. The box in which the towel and blanket had been stored was moved from its usual place on the 19th. The bodies were tied with a hitch knot peculiar to the kind which Kamienski customarily made. The blanket and the hitch knot permit an inference that Kamienski lent assistance.
When Duckworth and Kamienski left Alongi's house the night of the 19th, Kamienski told her he could not control what *104 happened. He said Henry was killed first and that Barbara did not suffer. Kamienski told Duckworth that if they did not stop talking about it, he would not be able to protect her or himself. Duckworth testified that Alongi and Kamienski later threatened her life. Duckworth stated that shortly after the bodies were discovered, Kamienski had her call Alongi before he was questioned by the police. Alongi called Kamienski twice before any questioning and 5 times in the next 6 days after the bodies were found.
Yurcisin testified that Marzeno shared the cocaine with Kamienski. Kamienski had a lot of good quality cocaine which he supplied to Duckworth. Shortly after the murders, Kamienski started looking for a grinder to make powder out of rock cocaine.
From the evidence presented including reasonable inferences to be drawn therefrom, the jury could have believed and in fact did find that Kamienski was part of a conspiracy to obtain drugs from the DeTournays. The jury could have believed that although Kamienski was not part of an agreement or conspiracy to rob the DeTournays of the drugs or to murder them, he did purposefully lend assistance and aid to Marzeno in the commission of the robbery and murders. It was up to the jury to determine the meaning and significance of Kamienski's conduct. His intent or purpose can be inferred from all that Kamienski did and/or said before, during and after the robbery. A jury could reasonably infer that Kamienski used his friendship with Henry DeTournay to set up the drug deal and that he introduced him and vouched for him to Alongi and Marzeno. The jury could also infer that Henry had Kamienski's telephone and beeper numbers so he could always contact him about the impending drug deal Kamienski brokered.
The jury could infer that because Kamienski and Duckworth were always together, he needed to be free of her as a potential witness to what was to transpire when the drug deal was finalized. Kamienski was not with Duckworth between 2:30 *105 and 7:30 or 7:45 p.m., at which time Kamienski took her to Alongi's home and told her to stay upstairs in the kitchen. The jury could have inferred that by prearrangement, Kamienski took steps to remove a potential eye witness from the scene of a robbery and murder and that his conduct constituted facilitating the commission of the crimes with the required shared intent or purpose. See State v. Rivera, 232 N.J. Super. 165, 174, 556 A.2d 1227 (App.Div.), certif. denied, 117 N.J. 169, 564 A.2d 885 (1989).
Under our law, even though Kamienski may not have been a party to the planning of the robbery, any purposeful or knowing participation in furtherance of the crime makes him guilty as an accomplice. We therefore conclude that under Marshall, Brown, Reyes and Gelb, the evidence against Kamienski was sufficient to warrant submitting the case to the jury on all of the charges. Circumstantial evidence need not preclude every other hypothesis in order to establish guilt beyond a reasonable doubt. State v. Mayberry, 52 N.J. 413, 436, 245 A.2d 481 (1968), cert. denied, 393 U.S. 1043, 89 S.Ct. 673, 21 L.Ed.2d 593 (1969). A conviction may be based solely on circumstantial evidence if it is sufficient to generate a belief of guilt beyond a reasonable doubt. State v. Papitsas, 80 N.J. Super. 420, 424, 194 A.2d 8 (App.Div. 1963).

ALONGI'S INVOLVEMENT
Based on the evidence mentioned up to this point, the jury could have found that Alongi was part of a conspiracy to obtain cocaine from the DeTournays and then distribute it, that he never intended to pay for his share of the cocaine, that he was aware that Marzeno intended to use a gun to rob the DeTournays of the cocaine and to kill Henry rather than pay for the cocaine, that he assisted further by allowing his home to be used as the rendezvous spot and that he gave directions to his house to Henry on the 18th when the date for the transfer of the drugs changed from the 18th to the 19th and the place was *106 changed from the Holiday Inn to Alongi's home. Alongi's telephone number and directions to his house were found on Henry's body. Because Henry and Alongi were not social friends or drug buddies, Alongi required Kamienski to vouch for Henry.
The jury could also infer that Alongi not only permitted his house to be the scene of the robbery and murder, but that he escorted Henry into his house under the pretext of counting the money before the cocaine was to arrive. There was strong evidence that he picked up Barbara from the Holiday Inn on the 19th and drove her to his house and that Henry and Barbara were murdered in his house while he was at home. During the course of the murders, the carpet in his garage was stained with blood necessitating a change in the carpet. An additional inference is that his boat was used to transport the bodies from the marina behind his house into the Barnegat Bay and that he dumped the bodies after attaching concrete blocks to them. Two or three days after dumping the bodies, Alongi referred to Marzeno as his partner while assuring Lehman that Alongi would be getting kilo quality cocaine. Alongi, a nonuser of cocaine, received a share of the cocaine without paying for it.
There was additional evidence that Alongi threatened Duckworth. Shortly after Duckworth and Sullivan returned from the mall, Alongi took Duckworth into one of his bedrooms. He pointed to a telephone with the label "Hit man." He then pointed to a gun in a drawer and told Duckworth that if she did not remain quiet about what she saw, she could end up dead like the DeTournays. He told her that if she talked, Kamienski would not be able to protect her.
We are persuaded therefore that viewing the evidence in its totality, direct and circumstantial and reasonable inferences to be drawn therefrom, any rational trier of fact could have found the essential elements of felony murder and murder by Alongi as an accomplice to Marzeno beyond a reasonable doubt. The jury could have found that Alongi and Kamienski not only acted *107 concurrently with Marzeno, but that they also shared his purpose.
As to Kamienski and Alongi, the trial judge erred when he concluded that their conduct in helping to dispose of the bodies could not be considered in determining whether they were accomplices to robbery, felony murder and murder. As we have pointed out, this is not a case where Alongi and Kamienski were only involved in disposing of the bodies. From the evidence, the jury was free to conclude that they were acting as accomplices of Marzeno on and even before the afternoon of the 19th. Based on that evidence, the jury was properly permitted to consider their conduct in helping to dispose of the bodies along with all the other evidence, including their conduct and spoken words shortly thereafter, in deciding whether they acted with purpose to facilitate the crimes of felony murder or murder. Simply because the conduct associated with disposing of the bodies may have violated a particular provision of the Code also, did not preclude the jury's consideration of that conduct as accomplices to felony murder and murder.
Under the State's appeal, we conclude that the trial judge erred in finding that his charge was erroneous. We also conclude that the evidence against Alongi and Kamienski was sufficient for any rational jury to find them guilty of felony murder and murders. Because the j.n.o.v. was entered pursuant to R. 3:18-2, principles of double jeopardy do not preclude reinstatement of the jury verdicts. R. 2:3-1(b)(3); United States v. Scott, 437 U.S. 82, 90-91, 98 S.Ct. 2187, 2193-94, 57 L.Ed.2d 65, 74 (1978); United States v. Martin Linen Supply Co., 430 U.S. 564, 570-571, 97 S.Ct. 1349, 1354-55, 51 L.Ed.2d 642, 650-651 (1977); State v. Kleinwaks, 68 N.J. 328, 331-337, 345 A.2d 793 (1975).

IV. DEFENDANTS' CHALLENGE TO JURY SELECTION
Alongi and Kamienski contend that the jury selection process violated their right to due process and deprived them of *108 a fair trial. They contend the judge conducted an improper voir dire by allowing open court questioning of potential jurors in the presence of other potential jurors.

A.
Fourteen persons were first placed in the jury box. The voir dire of several jurors disclosed their personal experiences with family members involving drug abuse. These jurors were excused by the court. Potential jurors also explained their exposure to media accounts of the murders. They felt that because of the media accounts, they could not be fair and impartial and were also excused by the court. One potential juror stated that what he read four or five years before the trial started did not depict "a pretty picture." This juror was also excused by the court.
One of the defense attorneys summarized the objectionable statement by a potential juror seated in the box in this manner:
And I think one of the most important problems was that jurors were permitted in open court to, in effect, bare their souls to the Court. We had a situation where one woman broke down and cried about the fact that she had a terrible situation in her family about drugs. We had another gentlemen who almost broke down because he had lost, I think he said he lost two relatives or two people as a result of drugs.
Then there were three or four other people who got emotional about the issue of drugs, and started  and I don't know whether or not they were telling the truth. I am inclined to believe that some of them, as Your Honor indicated, were not telling the truth.
I believe the old lady who broke down and the gentleman, the other gentleman who almost broke down, were telling the truth. A couple of other ones I don't believe, but I don't think it matters for the purpose of my argument.
R. 1:8-3(a) controls the examination of jurors: "For the purpose of determining whether a challenge should be interposed, the court shall interrogate the prospective jurors in the box after the required number are drawn without placing them under oath." Only in a death penalty case does the rule provide otherwise. Even though the rule was enacted in 1969, it is silent as to whether the past practice of not sequestering a jury during voir dire in a non-capital case survived. State v. *109 Manley, 54 N.J. 259, 255 A.2d 193 (1969), did not change that past practice. That past practice was articulated in State v. Sullivan, 43 N.J. 209, 239-240, 203 A.2d 177 (1964), cert. denied, 382 U.S. 990, 86 S.Ct. 564, 15 L.Ed.2d 477 (1966), which held that the decision whether to sequester a jury is discretionary with the trial judge. Similarly, State v. Rios, 17 N.J. 572, 586-589, 112 A.2d 247 (1955), rejected the idea of a mandatory sequestered voir dire. The Rios Court, as did the judge in the present case, recognized that an educational process occurs during jury selection in which potential jurors are made aware of the importance of a trial before a fair and impartial jury. Id. at 589, 112 A.2d 247. This educational process was given recognition recently in State v. Moore, 122 N.J. 420, 446, 585 A.2d 864 (1991).
Here, the judge instructed the jury several times that an educational process was occurring for the purpose of finding a fair and impartial jury. The open candor expressed by many prospective jurors is indicative of the fact that they too recognized the need for a fair and impartial jury. Even though their views were expressed from the jury box, the judge hammered home the point that the ultimate verdict had to be based on the evidence present during the trial.
The alleged damaging responses given by prospective jurors during the voir dire related to the experiences of family members with drug problems, some of which were even fatal. But unfortunately, that is the reality of the society in which we live today. Even though we are satisfied the panel was not tainted, we recognize that the better practice is for the judge to inform the panel that if anyone has a personal reason why he or she cannot be fair and impartial in the case on trial, that person should come to the sidebar to inform the judge and counsel privately on the record. See R. 1:2-2. In that way the risk of prejudice is minimized.
Our careful study of the record satisfies us that the "overall conduct of the voir dire in this case was sufficiently probing to *110 assure that defendant[s] received a fair trial by an impartial jury." State v. Moore, supra, 122 N.J. at 446, 585 A.2d 864. We are also satisfied that counsel's participation in the voir dire was sufficient and did not represent any abuse of discretion by the trial judge. State v. Manley, supra, 54 N.J. at 281-283, 255 A.2d 193. We therefore find no mistaken exercise of discretion in not conducting a sequestered voir dire or in limiting counsel's participation in the voir dire. The jury was asked all pertinent questions suggested by counsel and the trial judge was satisfied that the jurors who deliberated were fair and impartial. See State v. Singletary, 80 N.J. 55, 62-63, 402 A.2d 203 (1979).

B.
Defendants further contend that the sequential method employed in the exercise of peremptory challenges was unfair and prejudicial. Before the challenging began, the judge informed counsel the procedure would be as follows:
THE COURT: We will do it in sliding rotation. I will invite Mr. Millard [Prosecutor] to go first, and I will proceed in all cases in sequence. The sequence of the matter will be the State, Marzeno, Alongi, [and] Kamienski. The first round I'll start with him [Prosecutor]; second round I'll start with Peduto [Marzeno]; third round I'll start with Russell [Alongi]; fourth round I'll start with you [Kamienski]; will go back to the State; and we will keep going in that sequence.
That will be the sequence that I use for jury selection, that will be the sequence I use for openings, that will be the sequence I use for examination [of witnesses], and that will be the reverse of the sequence I use for closing.
The attorneys clearly understood the procedure. The judge assured all counsel that if an attorney passed on a challenge or found the jury satisfactory as constituted, that attorney had not waived his right to exercise a peremptory challenge in succeeding rounds, provided he had unused challenges remaining and the jury had not been found satisfactory by all counsel. No objection to the announced procedure was raised by either attorney.
*111 Whenever a prospective juror seated in the box was excused through a peremptory challenge, the judge did not fill that seat until that round of four challenges (one by each attorney) had been completed. Defendants contend that by forcing them to challenge with less than fourteen prospective jurors in the box, they could not make a proper evaluation of which juror to challenge. We agree with defendants that each time a prospective juror was excused for cause or through the exercise of a peremptory challenge, that prospective juror should have been replaced before any attorney or litigant was called upon to exercise a peremptory challenge. In so doing, potential problems, which did not develop in this case, can be avoided. Our careful study of the record persuades us to conclude that the procedure employed caused no prejudice to defendants.
Based on the charges of murder and felony murder and the fact that defendants were tried jointly, R. 1:8-3(d) allocated 18 challenges to the State and 10 to each defendant. See also N.J.S.A. 2A:78-7c. The jury was found to be satisfactory to all counsel at the end of 28 rounds of challenging. At that time, only Marzeno had exhausted his full compliment of peremptory challenges; Alongi had one and Kamienski had three remaining. Six of nine challenges exercised by Alongi occurred with one vacant seat in the jury box. His last three challenges were exercised during the last 11 rounds when all 14 seats were filled. Kamienski exercised all of his challenges with all the seats filled.
State v. Brunson, 101 N.J. 132, 145, 501 A.2d 145 (1985), recommends that "the customary, one-for-one, alternating method" be followed while the Criminal Practice Committee studies the problem. No rule has been adopted.[2]Brunson did *112 not define the meaning of "the customary, one-for-one, alternating method." We believe the Court had the so-called alternating system in mind wherein the State challenges first followed by each defendant in each round. See State v. Brunson, supra, 101 N.J. at 143, n. 5, 501 A.2d 145.
In reality, a one-for-one alternating method was followed in this case. Sequential rotation was followed which permitted each defendant to pass after a challenge by the State or co-defendant. In that way it amounted to one defense challenge to one challenge by the State while the other defendants were free to pass. Indeed, there were only four rounds (Rounds 3, 9, 16 and 17) in which two defendants exercised a challenge in the same round. It was one-for-one in the other 24 rounds of challenging. Our review of the record satisfies us there was no prejudice to defendants and no abuse of discretion in failing to replace a challenged prospective juror in a round before requiring a defendant to challenge or pass. See United States v. Blouin, 666 F.2d 796 (2d Cir.1981).
Furthermore, the failure of counsel for Alongi and Kamienski to exercise more of their peremptory challenges during the 28th round when 14 prospective jurors were seated in the jury box, is clearly indicative that counsel did not truly feel the procedure was prejudicial or that the jury was not impartial. See State v. Bey, 112 N.J. 123, 154-155, 548 A.2d 887 (1988); State v. Belton, 60 N.J. 103, 107-108, 286 A.2d 78 (1972); compare State v. Deatore, 70 N.J. 100, 105, 358 A.2d 163 (1976); State v. Pereira, 202 N.J. Super. 434, 438, 495 A.2d 431 (App.Div. 1985).
*113 In addition, the trial judge expressed his confidence in the fairness of the jury during its deliberative process. The judge observed that in his opinion the jury picked its way through the facts, "followed the court's instructions, differentiated between conspiracy and accomplice status and found [Alongi and Kamienski] not guilty of the conspiracy [to rob and to murder] and guilty as accomplices." Even though we do not approve of the jury selection procedure employed in this case respecting the failure to immediately replace each excused and prospective juror, we share the trial judge's view that the trial jury was fair and impartial. Hence, any error associated with the selection of the jury was harmless beyond a reasonable doubt. R. 2:10-2.

V. MERGER OF CONSPIRACIES
Defendants Alongi and Kamienski contend that the conspiracies under Counts Six and Seven should merge for sentencing purposes because they comprise a single conspiracy. See N.J.S.A. 2C:5-2. When denying the motion to merge the conspiracies, the judge stated that he was satisfied from the evidence and the verdict of the jury that the two conspiracies were separate in time, fact and scope. He stated the first conspiracy, alleged in Count Seven, was that defendants conspired with each other, Henry and Barbara DeTournay and Sidney Jeffrey, II, "to bring the cocaine into New Jersey and for the defendants to acquire it with intention or purpose of distributing it." The judge reasoned that the scope of the first conspiracy was to acquire possession of the cocaine in New Jersey. The judge stated that the second conspiracy, under Count Six, involved only the defendants which began on September 19 after the victims had been killed. The scope of that conspiracy was to share in the cocaine without being caught. The DeTournays and Jeffrey were not part of the second conspiracy.
*114 State v. Truglia, 97 N.J. 513, 521, 480 A.2d 912 (1984) instructs that in a merger analysis, we have become more comfortable in recent years with the flexible approach formulated in State v. Davis, 68 N.J. 69, 342 A.2d 841 (1975) rather than a mechanical one. See also State v. Dillihay, 127 N.J. 42, 601 A.2d 1149 (1992); State v. Cole, 120 N.J. 321, 325-330, 576 A.2d 864 (1990). The Davis flexible approach entails an analysis of the evidence in terms of such factors as: (1) the time and place of each conspiracy; (2) whether the proof submitted under Count Seven was a necessary ingredient for a conviction under Count Six; (3) defendants' intent or purpose at the time of the two alleged conspiracies; and (4) whether the conspiracy alleged in Count Six was an integral part of a larger scheme under Count Seven. State v. Davis, supra, 68 N.J. at 81, 342 A.2d 841.
Although a close issue is presented, based on the evidence we disagree with the verdict of the jury and the decision of the trial judge as a matter of law that two separate distinct conspiracies were involved. Under the Davis flexible approach, the single purpose of the conspiracy was to obtain the cocaine for distribution. The role played by defendants, Jeffrey and the DeTournays was to get the cocaine into New Jersey so that it could be distributed. The ultimate conspiratorial goal of everyone was to get the cocaine from Florida to the defendants for profitable distribution. The success of that ultimate objective depended upon each member of the conspiracy carrying out his or her assigned role.
Both conspiracies charged the same time interval and objective. The evidence revealed that the drug deal was negotiated on or about September 9, that Jeffrey arrived in Toms River from Florida with the cocaine on September 17, that defendants took possession of the cocaine on September 19 and that some of the cocaine was distributed by the first week in October 1983 or sooner. Count Six alleged conspiratorial acts occurred in Florida and in Ocean County with respect to Jeffrey and the DeTournays. Because Jeffrey and the DeTournays were the *115 only Florida connection, the two counts must be read as charging a continuing conspiracy.
Therefore, under the Davis flexible approach and the totality of the circumstances approved in State v. New Jersey Trade Waste Ass'n, 96 N.J. 8, 24-27, 472 A.2d 1050 (1984), we conclude that the conspiracy to possess cocaine with intent to distribute under Count Six merges with the conviction under Count Seven as to Alongi and Kamienski. There was only a single conspiracy respecting the drugs that cannot be broken into two separate conspiracies. See State v. Ferrante, 111 N.J. Super. 299, 303, 268 A.2d 301 (App.Div. 1970); Cannel, New Jersey Criminal Code Annotated at 208-209 (1991 ed.).

VI. OTHER ISSUES
We have considered the remaining issues raised in the respective briefs and find they are clearly without merit. R. 2:11-3(e)(2). We add, however, that we have examined the color photographs of the victims presented into evidence by the State. They were neither gruesome nor prejudicial to defendants. State v. Marshall, supra, 123 N.J. at 98-99, 586 A.2d 85. Their admission did not represent any abuse of discretion. State v. Thompson, 59 N.J. 396, 420, 283 A.2d 513 (1971). We have also examined the record with care respecting the prosecutor's conduct and find that he did not exceed the parameters of "permissibly forceful advocacy" established by decisional law. State v. Marshall, supra, 123 N.J. at 160-161, 586 A.2d 85; State v. Ramseur, supra, 106 N.J. at 322, 524 A.2d 188; State v. Mayberry, supra, 52 N.J. at 437, 245 A.2d 481.
Finally, the trial judge did not abuse his discretion in denying Kamienski's motion for a severance. State v. Brown, 118 N.J. 595, 603, 573 A.2d 886 (1990). Based on the allegations in the indictment, a joint trial was clearly appropriate. State v. Moore, 113 N.J. 239, 273, 550 A.2d 117 (1988).

*116 VII. SUMMARY
Under the State's appeal (A-3689-88T5), we reverse the judgments of acquittal notwithstanding the verdicts of the jury. We reinstate the jury verdicts on Counts One, Two and Five. The conviction under Count Five becomes mere surplusage in this case.
Under Alongi's appeal (A-3611-88T5), we affirm the verdicts of the jury on all counts. We remand for sentencing on Counts One and Two after merging Count Five with those counts. The sentence imposed on Count Six is vacated and that count is merged with Count Seven. The judge is free to reconsider the sentence imposed on Count Seven.
Under Kamienski's appeal (A-2350-88T5), we affirm the verdict of the jury on all counts. We remand for sentencing on Counts One and Two after merging Count Five with those two counts. The sentence imposed on Count Six is vacated and that Count is merged with Count Seven. The judge is free to reconsider the sentence imposed on Count Seven.
The appeal filed by Marzeno (A-3946-99T5) has heretofore been dismissed.
The matter is remanded to the Law Division for sentencing on Counts One and Two and for the entry of amended judgments of conviction in accordance with this opinion. We do not retain jurisdiction.
NOTES
[1] Although the felony alleged under Count Five was robbery, the State did not indict either defendant separately for robbery. Two felony murders were charged under a single count, Count Five.
[2] The Criminal Practice Committee's latest recommendation to the Supreme Court is that no fixed order for the exercise of peremptory challenges be established in multi-defendant cases, but that the trial judge advise the parties, prior to the exercise of the first challenge, as to the rotation for challenges to be exercised. By this recommendation, the Committee endorsed the concept that the order of peremptories should be fixed as appropriate in the unique circumstances of the case, based upon the number of defendants and number of challenges, after consideration of the position of the parties. While the Supreme Court has not ruled upon the 1992 report of the Criminal Practice Committee, we note that in this case the encouraged policy was promoted by the procedure followed with respect to the exercise of the order of peremptories. 130 N.J.L.J. 558, 559, 1 NJL 193 (1992).